**COLONIAL LIFE AND ACCIDENT IN-SURANCE COMPANY, Appellant,**

v.

**Sarah Ethel WILSON, Appellee.**

No. 16290.

United States Court of Appeals
Fifth Circuit.

July 19, 1957.

Rehearing Denied Sept. 18, 1957.

Sam Rice Baker, Montgomery, Ala., S. Augustus Black, Columbia, S. C., and R. E. Steiner, III, Montgomery, Ala., Steiner, Crum & Baker, Montgomery, Ala., and McKay, McKay, Black & Walker, Columbia, S. C., of counsel, for appellant.

Truman Hobbs, Montgomery, Ala., Frank J. Tipler, Jr., Andalusia, Ala., and Godbold, Hobbs & Copeland, Montgomery, Ala., for appellee.

Before BORAH, RIVES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The principal question is whether an insurance company may, and did, permit the Assured to keep the policy in force by the mailing of premium checks never shown to have been actually received. Subsidiary to this main question which raises the sufficiency of the evidence to support the jury verdict for the beneficiary are procedural matters relating to the charge to the jury.

George Wilson, owner of a business and apparently regarded as a sufficiently responsible and substantial business man to qualify for the Insurer's "Executive and Professional Accident Policy," died from accidental means June 28, 1955. He had carried this policy since July 31, 1951, when he was then 36. Except for nonpayment of premiums, it was expressly declared to be "non-cancellable and guaranteed renewable to age eighty * * *." Under optional premium payment plans (annual, semi-annual, quarterly or monthly), it was written for the period of the premium payment, in this case one month. While this denominated it a monthly policy, the Insurer, for the premium payment plan, treated the anniversary date as July 31 of each year. There is no dispute that for the years 1951–1952, 1952–1953, 1953–1954 (ending July 31, 1954) the premium was promptly paid in full by the method soon described. The question narrows down to whether, in July or August 1954, a sufficient "payment" of the next twelve months' premium was made to keep it in force for the eleven months up to the time of the Assured's death.

It was stipulated that no payments were made by the Assured in *cash* subsequent to the premium payment of June 30, 1954, and the beneficiary (Mrs. Wilson) does not have and cannot produce any cancelled check or premium receipt representing payments subsequent to June 30, 1954, or any bank statement reflecting payment as premiums on the policy subsequent to June 30, 1954.

On it the Insurer claimed, and now reiterates, that the policy lapsed or terminated by its own terms for failure to pay premiums. Underlying this was the persistent demand that the policy

term[1] required cash with an official receipt which "according to the law of the Medes and Persians * * * altereth not," Cargill, Inc., v. Compagnie Generale Transatlantique, 5 Cir., 235 F.2d 240, 242, 1956 A.M.C. 1545, 1547. With this as the major theme, recurring from time to time as the structure develops, the Insurer, urging[2] what is in reality not in dispute, that the policy was for one month and would not be effective unless, for the next month, the premium were paid becomes almost transfixed by its preoccupation with another principle of universal acceptance—that ordinarily, in the absence of a clearly expressed intention to the contrary, payment by check is conditional only until honored and paid on presentment.[3] From this it presumably argues that since the check is not payment until cashed, it could under no circumstance constitute such payment as would keep the policy in force if never received, or if received, never acknowledged by the official[4] receipt, note 1, supra.

But this ignores altogether what the Insurer did and what Alabama considers an insurer may do or lead an assured to think it has done, Travelers' Ins. Co. v. Brown, 138 Ala. 526, 35 So. 463. Undoubtedly the Insurer could have insisted on strict literal, formal, punctilious compliance with the policy provisions, note 1, supra. But it did not. And this was neither inadvertent nor the result of careless or slovenly business habits. It was the result of an adoption of a com-

---

1. "1. Premiums are payable at the Home Office of the Company, but may be made to an authorized agent of the Company on or before the dates when due, in exchange for official receipts signed by the President or Treasurer and countersigned by such agent. Such a receipt shall be the only evidence of payment binding upon the Company. The payment of any premium shall not maintain the policy in force beyond the date when the next payment becomes due, except as herein provided.

   "2. In the payment of any premium except the first, a grace period of fifteen days without interest will be allowed, during which time the policy will remain in force."

2. It relies on the cases holding industrial group accident and life policies are term policies for the period covered by the premium payment ordinarily deducted by the employer: Pacific Mutual Life Insurance Co. v. Watson, 223 Ala. 571, 137 So. 414; Travelers' Insurance Co. of Hartford, Conn. v. Atkinson, 198 Ala. 509, 73 So. 903; Id., 202 Ala. 226, 80 So. 48; Mutual Benefit Health & Accident Association v. Kennedy, 5 Cir., 140 F.2d 24; Talbot v. Union Central Life Insurance Co., 5 Cir., 241 F. 669; cf. New York Life Insurance Co. v. Statham, 93 U.S. 24, 23 L.Ed. 789.

3. It urged especially the following excerpts from cases upon which certain indicated requested charges were based: Carcaba v. McNair, 5 Cir., 68 F.2d 795, 796: "A check is not payment until itself paid unless expressly accepted as payment." Jefferson Standard Life Insurance Co. v. Wisdom, 5 Cir., 58 F.2d 565, 566: "A check is not payment until itself paid, unless specially accepted as payment," of which Insurer's requested charge No. 9 was a paraphrase. As the basis for charge No. 7, Ross v. State Life Insurance Co., 225 Ala. 410, 411, 143 So. 827: "And this is in harmony with the expressions found in our own cases to the effect that, in the absence of an agreement to the contrary, a check is merely a conditional payment, and is presumptively received, not as a payment, but 'as a convenient means of getting the money.'" People's Bank & Trust Co. v. Walthall, 1917, 200 Ala. 122, 75 So. 570, was the asserted source of requested charge No. 8 which read: "A check received in payment of an obligation is not the same as cash unless it is so accepted and treated by the party receiving it and unless it is so received and treated it in law is not a payment." And requested charge No. 6 came from language in Jefferson Motors Co. v. Williams, 1933, 227 Ala. 432, 434, 150 So. 355.

4. Under our disposition of the case, we do not reach the Insurer's peremptory insistence that insurance companies can insist on the literal, formal receipts prescribed, for which it cites Independent Life Insurance Co. v. Woods, 23 Ala.App. 590, 129 So. 487, 488; Berryhill v. Ellett, 10 Cir., 64 F.2d 253, 257; Braman v. Mutual Life Insurance Co., 8 Cir., 73 F.2d 391, 393–394; Lata v. New England Mutual Life Insurance Co., D.C.N.Y., 68 F.Supp. 542, 544; Lauze v. New York Life Insurance Co., 1907, 74 N.H. 334, 68 A. 31, 32, 34.

prehensive plan by which, as far as possible, the thousands of routine recurring items of an insurance company could be performed by or through the miraculous capacity of IBM machines.

If not altogether, at least as to the Executive and Professional Accident Policy, it was of acknowledged benefit to the Insurer for the Assureds to pay, not in cash, but by check. And it facilitated it further for the Assured to use the postdated "Series Checks" prepared and transmitted by the Insurer to the Assured for that purpose. Thus, 12 days prior to the anniversary date (here July 31, 1954), almost as though this Artzybasheffian marvel has reached down to pluck it out of the file, a First Notice was mailed to the Assured. This notice, as well as the Second Notice and the third, Final Notice, were prepared in manifold form from punch cards by the IBM printer and sorter. The "Series Checks" were likewise printed from punch cards by IBM on paper with punch holes at each end permitting processing in these machines. The machine automatically printed on the check the policy date, name of the Assured's bank on which the check was drawn, the predetermined postdate for each of the successive twelve checks and the amount. All was done save the Assured's signature as the drawer. These "Series Checks" were sent with the First Notice, and, when returned signed by the Assured, were placed in a file from which as each month rolled around, that month's check was removed, more cards were punched to show payment of the premium, credit to the writing agent's account, and a deposit to the Insurer's bank account. With 500 to 1,000 pieces of mail on an average day and twice as many on Mondays or following holidays, two-thirds of which were premium payments, it was of great advantage, if not necessity, to the Insurer that this all be as routine as possible. The more that checks were used, and indeed, the more the "Series Checks" plan was followed, the more fixed was the routine, the greater the savings in personnel time, and the less chance there was of error. And, of course, the system was keyed to the handling of it once each year on an annual basis.

When the First Notice was sent just prior to the anniversary date, a set of twelve "Series Checks" was enclosed for the next year. In the plainest of simple English words, this Notice told[5] the Insured that if he would *sign* and *return* the "Series Checks," it was assurance "that your policy will be kept in force for another twelve months' period * * *." Not only that, the Notice left it to the Assured to exercise the option

5.
"Colonial Life & Accident
Insurance Company
Columbia, S. C.
"The monthly premium on the insurance contract below will become due on the date shown.
Policy Number    Due Date
                     19
                  Agency
    Premium
Series of 12 checks enclosed
                  Premium
                  Notice
    Please Return This Notice
         With Check Series
"Dear Policyholder:
"The last of your series of checks in the amount of $    | each covering the monthly premiums on the above policy has been deposited. We are enclosing herewith a new series of checks for you to sign and return to this office, thus assuring that your policy will be kept in force for another twelve months' period. We appreciate very much your placing a part of your insurance with our Company. If we can be of service in any way, be sure to let us know.
                  "J. Clifton Judy
                  "Treasurer
"Optional Premium Payments
"If you prefer not to continue using the check plan as outlined above for the payment of your premium, the premium can be paid on the following basis:
"Annual Premium $    |
"Semi-Annual Premium $    |
"Checks, Drafts and Money Orders should be made payable to Colonial Life & Accident Insurance Company. Be Sure Your Protection Is In Force When You Need It

of using the check plan devised by the Insurer or, as indicated, the alternative annual or semiannual premium.

Under the "Series Check" plan, if, by the anniversary date, the "Series Checks" were not received from the Assured properly signed and ready for filing for later serial deposit, a Second Notice[6] (without another set of checks) was sent. Again, by simple, plain words the Assured was informed that all that was needed was to *sign* and *return* the checks for it stated, "By signing and returning these checks today you can be assured that your future is protected." And, of great importance, the Assured was informed that if he had done these things, no further action was required for, "If these checks have already been mailed please disregard this notice."

If, by the fourth or fifth day after the anniversary date, the checks had not yet been received by the Insurer, the third and Final Notice was sent specifying the expiration of the grace period by date. Another set of "Series Checks" was enclosed and by this Final Notice,[7] it again directed that "if you have al-

ready mailed a series of checks on this policy please disregard this notice." This was repeated by the very last words on the reverse side which contained another statement of decisive significance that "Payment of this premium must be tendered, and if *mailed,* your remittance must be post-marked not later than the last day of grace." It was a geographical fact beyond dispute, categorically admitted in the plainest of testimony from a highranking executive officer of the Insurer, that a check mailed with a post-mark not later than the last day of grace obviously could not clear and be cashed within the grace period, so that the mailing, at least if subsequently received, of that check was sufficient "payment" to keep the policy in force.

Since this language was so simple, so direct, so oft repeated in various ways, to inform the Assured that use of the "Series Checks" by mail would enable the Assured to keep the policy alive, it was, if not as a matter of law, certainly as a fact issue, adequate, if followed, to make the mailing of the check a sufficient payment to keep the policy in force, note 10, infra.

6. As a manifold copy, the Second Notice form was substantially as the First Notice, note 5, supra. The main paragraph stated:
"Dear Policyholder:
"The last of your series of checks in the amount of $      each covering the monthly premiums on the above policy has been deposited. To date we have not received the new series of checks which were sent to you in the past few days. By signing and returning these checks today you can be assured that your future is protected. If these checks have already been mailed please disregard this notice."

7. On the same form as note 5, supra, the front side stated:
"Dear Policyholder:
"The last of your series of checks in the amount of $      each covering the monthly premiums on the above policy has been deposited. Some time ago we sent you a new series of checks to be signed. To date we have not received those checks. In case those checks have been lost we are enclosing another series. Please sign and return these

checks in the enclosed envelope. Please do this immediately as the grace period on your policy has almost expired. If you have already mailed a series of checks on this policy please disregard this notice."
The reverse side was as follows:
"This Is Your Last Notice ...........
"This 'Last Call' Notice is the *Final Notice* which will be given for the premium now past due on your policy. Payment of this premium must be tendered, and if mailed, your remittance must be post-marked not later than the last day of grace.
"Should you desire any information or service in connection with this premium payment or your policy communicate with us at once, in order that we will have time to serve you before the final date for payment expires.
"Be Safe—Make payment of this premium now—No Further Notice Will Be Given.
"Colonial Life & Accident Insurance Company
1612 Marion Street :-: Columbia, S. C.
"If Remittance Has Been Mailed Please Disregard This Notice."

There was ample evidence from which the jury could and presumably did, find that in the latter part of July, or first few days of August 1954, the Assured, George Wilson, was seen to have in his possession a group of "Series Checks" which he then and there signed and which were almost instantaneously mailed in a nearby United States Postal Mail Box, properly stamped and addressed to the Insurer. To be sure the evidence of the Insurer, in the operation of its mail room and IBM procedures, was impressive that it was almost impossible to lose a check and none had ever been lost, but this of necessity came from the records, not personal knowledge of each of the millions of transactions occurring since the system was instituted in 1940. And the evidence did show that, though unlikely, access could be had to the mail by unauthorized persons at least at one stage. And the experience of this case demonstrated that, as with the perfect crime, there was one place where the intricate procedure was not foolproof. It should be remembered here that after the First Notice each succeeding notice including the Final one instructed the Insured to disregard the Notice if the "Series Checks" had already been mailed. Thus, if the Assured in fact mailed them (as the jury verdict here requires us to assume was done), the Assured had no way of knowing that his checks had not been received[8] since no notice of lapse was sent[9] after failure to respond to the third Final Notice. And, at the same time, the premium payment department in its IBM routine treated it as though it had never been sent. There was no procedure to care for the situation in which the envelope containing the "Series Checks," or the "Series Checks" themselves had miscarried en route, had been received, but not processed because misappropriated, lost or mislaid.

Where an Insurer establishes a procedure by which premiums are to be remitted and considered "paid" sufficiently to keep the policy in force, a compliance with it by the Assured has that effect,[10] and whether the check is con-

---

8. The manifold forms, see notes, 5, 6 and 7, supra, contained a separate printed acknowledgment form which the Insurer claimed was mailed automatically after receipt of the "Series Checks." It stated: "We acknowledge with thanks receipt of series of checks. One check of the series will be deposited each month. The paid checks will serve as the actual receipts for the monthly premiums." This, the company claimed, would indicate to the Assured that the "Series Checks" sent by him had been received by the Insurer, and the absence of one would indicate that the "Series Checks" had not been received. There was ample evidence, however, from several policyholders which raised an issue of fact whether in fact this acknowledgment form was regularly sent or its absence would have the significance asserted.

9. Of course, none was required as a matter of law, Pacific Mutual Life Insurance Co. v. Watson, 223 Ala. 571, 573, 137 So. 414; Alabama National Life Insurance Co. v. Smith, 214 Ala. 585, 586, 108 So. 524; Penn Mutual Life Insurance Co. v. Fiquett, 229 Ala. 203, 206, 155 So. 702, but the absence of such a notice had some relevance as bearing upon a procedure which must have envisaged the possibility of checks actually sent, but not received and processed.

10. As a contractual matter, this depends on the intention of the parties of which, as here, the forms of notices and the procedure prescribed and followed are evidence. "The effect of mailing a premium, as regards payment, depends wholly upon the intention of the parties. While generally payment of a premium would not be effected until actual receipt by the insurer, where the insurer or its authorized agent requests or directs payment by mail, it is paid when such premium is dropped in the post-office." 14 Appleman, Insurance Law and Practice, § 7990, p. 250; and see, 14 id., pp. 251, 253. Currier v. Continental Life Ins. Co., 53 N.H. 538, 547; Travelers' Ins. Co. v. Brown, 138 Ala. 526, 35 So. 463; Kenyon v. Knights Templar, 122 N.Y. 247, 25 N.E. 299; Palmer v. Phoenix Mut. Life Ins. Co., 84 N.Y. 63; Guilfoyle v. National Life, 36 App.Div. 343, 55 N.Y.S. 236; Calvin v. United States Mutual Acc. Ass'n, 66 Hun. 543, 21 N.Y.S. 734; Brown v. Pilot Life Ins. Co., 185 S.C. 334, 194 S.E. 121, 122, 123; Protection Life Ins. Co. of Chicago v.

ditional, provisional, or absolute payment is not really the question.[11]

These matters were submitted under a charge which fairly presented the controlling issues. There was no error for declining the specified requests of the Insurer which related to the conditional or absolute character as payment of checks when received, for to the extent pertinent they were given in substance. And if an exception was adequately preserved, there was no error in the Court's giving one of the Assured's requested charges in the course of which the word "forfeit" was used at one place. To the jury it conveyed the idea of the policy being no longer effective for nonpayment of premiums. That was sufficient. For everyday men, the Court can use their language and will frequently do better than if he sticks to the heavy jargon of the law which, if clear to lawyers, is certainly not always so to juries.

Considering the way this case was brought under Alabama law, the forum state, 5 Moore's Federal Practice, § 43.-08, pp. 1336, 1337, the burden of prov-

ing nonpayment was properly placed on the Insurer. Sovereign Camp, W.O.W., v. Gay, 217 Ala. 543, 117 So. 78, 82; Independent Life and Accident Ins. Co. of Jacksonville, Fla. v. Cannon, 263 Ala. 565, 83 So.2d 288; United Benefit Life Ins. Co. v. Dopson, 232 Ala. 625, 169 So. 287; Pilot Life Ins. Co. of Greensboro, N. C. v. Hawkins, 222 Ala. 218, 131 So. 889; cf. Siller v. United States, 5 Cir., 195 F.2d 195. That should end the matter. Actually, from the reading of the whole charge, that burden was really put on the Insurer only as to nonreceipt and actual payment. As to the balance of the Assured's theory, i.e., the establishment of a procedure or course of dealing for payment of premiums by mailing checks and compliance with it by the Assured, the charge plainly stated that "The burden is on the Plaintiff to show what the course of the dealings was, to reasonably satisfy you as to the evidence as to what the course of dealings was in that respect."

If there are risks involved in this system, it is the Insurer's system to alter.

---

Foote, 79 Ill. 361; Schlotzhauer v. Central Mut. Ins. Co., 233 Mo.App. 1132, 128 S.W.2d 1061; Tippett v. Farmers' Mut. Fire Ins. Co., Mo.App., 47 S.W.2d 225, 227; Whitley v. Piedmont & Arlington Life Ins. Co., 71 N.C. 480; Postal Ind. Co. v. Rutherford, Tex.Civ.App., 49 S.W.2d 1115; Primeau v. National Life, 77 Hun. 418, 28 N.Y.S. 794, 797, affirmed 144 N.Y. 716, 39 N.E. 858; Krebs v. Security Trust & Life Ins. Co., C.C., 156 F. 294; Williams v. Carpenter & Co., 36 Ala. 9, 12; Mackey v. Dobrucki, 116 Conn. 666, 670, 671, 166 A. 393; Fant v. Miller, Tex.Civ.App., 218 S.W.2d 901, writ of error refused, NRE; McCluskey v. National Life, 77 Hun. 556, 28 N.Y.S. 931; Pennsylvania Lumberman's Mut. Fire Ins. Co. v. Meyer, 2 Cir., 126 F. 352; Reed v. Vermont Acc. Ins. Co., 110 Vt. 501, 9 A.2d 111; Tayloe v. Merchants' Fire Ins. Co., 9 How. 390, 398, 13 L.Ed. 187. Except for three cases which are immaterial and three cases which it says may be in point but contrary to Ripy v. Cloverleaf Life & Casualty Co., 5 Cir., 9 F.2d 324 (but which we consider did not deal with the situation of this record), the Insurer virtually concedes the correctness of all these cases but seeks to distinguish them as avoiding a forfei-

ture of an existing contract, not the termination of one by its own terms. Since in either case it is because the insurer has established a procedure which the assured may and did follow, the distinction is too subtle and escapes us.

11. So far as the steps to keep the policy in force are concerned, the evidence is undisputed. Under the IBM procedure, on receipt of a check or the serial deposit of a postdated "Series Check", it is immediately credited to the policyholder's and the writing agent's accounts, even though it has not yet been cleared and accepted by the drawee on presentment. So much so is it, that if a check is dishonored a special notice is sent to the assured stating that the check has been redeposited for clearance. And the third Final Notice, note 7, supra, permits a check to be postmarked within the grace period even though, when mailed, it cannot possibly arrive or clear until after the expiration of the grace period.

Of course, if not ultimately received and paid in fact, the insurer has the right to the actual payment of the premiums, Travelers' Ins. Co. v. Brown, supra; Hollowell v. Life Insurance Co. of Virginia, 126 N.C. 398, 35 S.E. 616.

If the risk of this system, or that of possible perjury by interested parties outweighs the evident savings in personnel and operating costs which leads its executives to declare that the procedure is highly beneficial to it, the Insurer can change it. The Insurer can refrain from advising the Assureds that mailing of checks will assure "that your policy will be kept in force for another twelve months' period" or that "by signing and returning these checks today, you can be assured that your future is protected." Until that is done, the Assured, unaware that his "Series Checks" have gone astray, if he complies with those directions, has the benefit of those assurances.

Affirmed.