**WOODMEN OF THE WORLD LIFE IN-
SURANCE SOCIETY, Appellant-
Appellee,**

v.

**Nelse S. KNUDSEN, As Trustee for Lud-
man Corporation, Debtor, Appellee-
Appellant.**

**Nelse S. KNUDSEN, As Trustee for Lud-
man Corporation, Debtor, Appellee-
Appellant,**

v.

**WOODMEN OF THE WORLD LIFE IN-
SURANCE SOCIETY, Appellant-
Appellee.**

No. 17787.

United States Court of Appeals
Fifth Circuit.

Feb. 25, 1960.

Rehearing Denied May 2, 1960.

George F. Meister, Miami, Fla., Smathers, Thompson & Dyer, Miami, Fla., of counsel, for appellant.

W. G. Ward, Miami, Fla., Ward & Ward, Miami, Fla., of counsel, for appellee.

Before RIVES, Chief Judge, and HUTCHESON and CAMERON, Circuit Judges.

CAMERON, Circuit Judge.

Before us are three appeals from orders entered by the court below in proceedings under Chapter 10 of the Acts of Congress relating to bankruptcy.[1] Woodmen of the World Life Insurance Society appealed separately from the court's order of December 15, 1958 and its order of June 30, 1959. The appeal of Nelse S. Knudsen, as Trustee for Ludman Corporation, the debtor, was taken from the order of June 30. The same questions of law and fact are involved, and the three appeals were consolidated by order of this Court and were presented to us as one case. Decision of the appeals will rest upon whether or not the court below correctly decided the following issues:

Whether the sale and lease-back agreement entered into between Ludman and Woodmen vested title to the property involved in Woodmen so that the lease agreements between Woodmen and Ludman created a landlord-tenant relationship; and, if so, whether Ludman defaulted in performance of the lease so as to terminate its rights under it and whether Woodmen waived its right to rely upon such termination.

The court below made its findings of fact and conclusions of law in the form of a memorandum opinion holding that Woodmen was the owner of the property, that Ludman had, before the institution of the Chapter 10 proceedings, defaulted in performance of the lease, giving Woodmen absolute right to possession, but that Woodmen had waived its right to enforce the termination of the lease. That opinion sets forth the facts succinctly and correctly and is reproduced in the margin [2] and we shall make

1. 11 U.S.C.A. § 506 et seq.

2. "On October 17, 1958, Woodmen Of The World Insurance Society filed its original Petition in this matter for an order directing the Trustee of the Debtor to surrender to Petitioner the premises occupied by the Debtor as its manufacturing plant, which Petitioner claimed was leased to the Debtor by a written lease agreement. The Petition recites that the lease was forfeited because of failure of the Lessee to pay taxes and rents as required by said lease.

"This Petition was amended on December 1, 1958, praying for an order that the Trustee vacate the premises in a reasonable time; pay reasonable compensation for the use and occupancy of the premises; that Petitioner be put in immediate possession of that portion of the premises sublet by Debtor to Sonken-Galamba Corporation; and that the Trustee be required to account to Petitioner for all rents he received from Sonken-Galamba Corporation.

"The Trustee answered the Petition contending that the alleged lease was in fact a mortgage and that if it were a lease the Trustee is entitled to equitable relief from the claimed forfeiture.

"Evidence was submitted to the Court by the parties together with briefs of counsel on the points of law involved.

"From the evidence in the record it appears that on May 27, 1952, Ludman Corporation was the owner of the fee simple title to the following land in Dade County, Florida:

[Description omitted.]

"At that time the land was vacant. Ludman Corporation desired to erect its plant buildings on the tract. It had difficulty in obtaining local financing of the project and its officers entered into negotiations with Woodmen Of The World Insurance Society to have that society issue its commitment to buy from Ludman Corporation the property after a building was erected at a price of $439,000.00, which was the actual cost of the land [$39,000.00] and the contemplated cost of the building [$400,000.00]. As a part of the transaction Woodmen Of The World Insurance Society would simultaneously with the execution of the deed to it by Ludman Corporation, enter into a lease of the premises to Ludman Corpora-

no further statement of the facts, except as may be necessary in developing the points presented by these appeals.

The order of June 30, 1959 based upon the memorandum opinion merely denied the petition of Woodmen for an order directing the Trustee of the debtor to surrender the premises occupied by it as its main office and manufacturing plant and its amended petition ask-

tion for seventeen (17) years with an option to renew the lease for nineteen (19) consecutive terms of five years each with a specified annual rental for these terms. On May 27, 1952, Ludman Corporation incorporated this offer in a letter to Woodmen Of The World Insurance Society.

"The offer was accepted by Woodmen with certain suggested conditions which were subsequently accepted by Ludman. Thereafter construction of the plant was commenced. During construction Ludman found that it needed a larger plant and by subsequent agreement Woodmen agreed to pay $440,000.00 for the building, making a total price for land and improvement of $479,000.00. By the agreement it was provided that Woodmen would pay no more than $479,000.00 and if the actual cost exceeded that figure Ludman would bear the additional cost. To carry on the construction, Woodmen borrowed $250,000.00 from a local bank. When the building was completed an appraisal was made by a local architect who estimated, the building had a value of approximately $447,400.00.

"On May 18, 1953, Ludman Corporation conveyed the property to Woodmen and received $479,000.00 therefor. At the same time Woodmen executed the lease agreement to Ludman.

"In September, 1955, Ludman requested Woodmen to erect an additional building on the premises under the same terms and conditions as the original arrangement. This was agreed to by Woodmen and the lease was amended to include the new building which cost approximately $40,000.00 and the monthly rents were increased for the balance of the seventeen year term from $3,490.26 to $3,840.56 commencing June 1, 1957. In addition to the rents, the agreement provided that Ludman would pay all taxes and insurance on the premises.

"Ludman made the payments of taxes and rents required by the lease as amended until July 1958, when it failed to pay the Dade County taxes on the property for the year 1957 which then were delinquent and amounted to $11,619.90. On July 10, 1958, Woodmen notified Ludman in writing that unless these taxes were paid and the outstanding tax certificate thereon redeemed within sixty (60) days after receipt of the notice, the lease would be immediately forfeited. This notice was received by Ludman July 14, 1958. Ludman never did pay these taxes.

"The installments of rent provided in the lease for the months of August and September 1958 were not paid when due. On September 3, 1958, Woodmen sent a notice by mail to Ludman advising that unless these rents were paid within thirty (30) days after receipt of the said notice, the lease would immediately cease and determine. This notice was received by Ludman on September 5, 1958.

"The sixty (60) day grace period for the payment of the taxes expired on September 12, 1958. The thirty (30) day grace period for the payment of the rents expired on October 5, 1958.

"On September 18, 1958, the Involuntary Petition for Reorganization was filed against Ludman Corporation in this cause. Subsequent to September 5, 1958, Ludman sent to Woodmen two checks to cover the delinquent rental payments. These checks were deposited by Woodmen on or about September 29th in its bank in Omaha but the checks were dishonored and not paid by the Miami bank upon which they were drawn because of notice of litigation involving the Lessee.

"On October 9, 1958, this Court approved the Debtor Petition in this cause.

"Upon the evidence submitted, the Court finds that the deed from Ludman to Woodmen was a valid conveyance of legal title to the property and was not a mortgage as claimed by the Trustee under the provisions of Section 697.01, Florida Statutes Annotated.

"In determining whether a conveyance valid on its face is in fact a mortgage, the intention of the parties is controlling. Such intention is to be determined from a consideration of all of the circumstances of the transaction.

"Nowhere in the negotiations between the parties is there any mention of a mortgage or a loan but the parties consistently described the transaction as a sale and a lease back arrangement. Ludman was then in no financial distress and was not indebted to Woodman. The price paid by Woodmen for the property was not grossly inadequate. Although the building cost exceeded to some undetermined extent the amount of the purchase price, it was very near to the actual appraised value. There was no provision

ing compensation for the use of the premises by the Trustee. This order, entered after full hearing, supplemented and, in effect, confirmed that entered by the court December 15, 1958 wherein the court below had tentatively rejected Woodmen's petition that the premises be turned over to it with compensation; and granted the Trustee authority, subject to court confirmation, to enter into a year's lease with Airtek Dynamics, Inc., or some other person or corporation which would put the plant into operation. Woodmen's appeal attacks the validity of those orders.

The Trustee's appeal is from the findings of the trial court in its memorandum opinion rejecting the Trustee's contention that the relationship between Woodmen and Ludman had been merely one of mortgagor and mortgagee; and

its holding that Woodmen was the owner of the property and that the lease had been in actual default prior to the institution of the bankruptcy proceedings

■■ The Trustee makes an extensive argument that, as a matter of law, the dealings between Woodmen and Ludman required the holding by the court below that, under Florida Statutes,[3] nothing more than a mortgagor-mortgagee relationship was established. A large number of authorities are cited to support this contention.[4] All of the authorities cited recognize that the duty of a court is to discover the intention of the parties from the writings they executed supplemented by such extraneous testimony as might be proper.[5] The trial court considered the writings and heard a number of witnesses testify, and

made for a repurchase of the property by Ludman. The testimony of Mr. Hoffman, its President, was that Ludman had no intention whatsoever of ever reacquiring the property. Ludman officials in their correspondence on this arrangement consistently described Woodmen as the owner of the property. There is a total lack of any evidence that Ludman ever considered the arrangement as anything but a landlord and tenant relationship.

"Petition of Woodmen of the World Insurance Society for an order directing the Trustee of the Debtor to surrender the premises, however, shall not be granted.

"It appears from the evidence that on September 12, 1958, the date of expiration of the grace period to pay up the delinquent taxes, Woodmen had an absolute right to take affirmative steps to remove the Lessee from the premises in accordance with the terms of the lease. However, instead of doing so, on September 29, 1958, Woodmen chose to accept the rent by depositing the rent checks for the months of August and September 1958 in its bank in Omaha, Nebraska. In addition Mr. Futcher, an official of the Lessor, Woodmen, when questioned at the hearing held on September 29th before this Court as to whether Woodmen considered the lease forfeited, testified that Woodmen was primarily interested in collecting the rent. This testimony affirmatively indicates that at that time Woodmen did consider the lease valid and subsisting. Such conduct on the part of Woodmen is clearly inconsistent with any contention that the lease was forfeited.

"An appropriate order will be entered herein in conformity with this Memorandum Opinion.

"Dated at Miami, Florida, this 29th day of June, A.D.1959.

"Joseph P. Lieb,
United States District Judge."

3. Florida Statutes, § 697.01, F.S.A. provides:

"All conveyances, obligations conditioned or defeasible, bills of sale or other instruments of writing conveying or selling property, either real or personal, for the purpose or with the intention of securing the payment of money * * * shall be deemed and held mortgages, and shall be subject to the same rules of foreclosure and to the same regulations, restraints and forms as are prescribed in relation to mortgages. * * *"

4. E. g., 22 Florida Jurisprudence, p. 186; Watkins v. Burnstein, 1943, 152 Fla. 828, 14 So.2d 569; Thomas v. Thomas, Fla. 1957, 96 So.2d 771; Mears v. Mayblum, Fla.1957, 96 So.2d 223; Griffin v. Kelly, Fla.1957, 92 So.2d 515; Cary & Co. v. Hyer, 1926, 91 Fla. 322, 107 So. 684; Horbach v. Hill, 1884, 112 U.S. 144, 5 S.Ct. 81, 28 L.Ed. 670; Helvering v. F. & R. Lazarus & Co., 1939, 308 U.S. 252, 60 S.Ct. 209, 84 L.Ed. 226; and 36 Am.Jur., pp. 768, 771.

5. Thomas v. Thomas, Fla.1957, 96 So.2d 771; Rosenthal v. LeMay, Fla.1954, 72 So.2d 289, 44 A.L.R.2d 336.

we think that the evidence under all of the authorities amply sustains its findings and its reasoning set forth in the opinion, Footnote 2 supra, and we approve and adopt them and hold that Woodmen was, and is, the owner of the property with which the court was dealing, and that the lease agreements between it and Ludman were valid and binding according to their terms and created a landlord-tenant relationship between the parties to said leases. We agree also with the sentence with which the court concluded this portion of its opinion:

"It appears from the evidence that on September 12, 1958, the date of expiration of the grace period to pay up the delinquent taxes, Woodmen had an absolute right to take affirmative steps to remove the Lessee from the premises in accordance with the terms of the lease."

We do not agree with the immediately following conclusion stated by the court in its opinion, and think that it committed an error of law in holding that Woodmen had waived its right to rely upon said termination, which became absolute on September 12, 1958, or was estopped to assert and maintain the rights spelled out in the foregoing quotation.[6] The court below based its conclusion that Woodmen had waived upon two grounds: by depositing two rent checks on Sept. 29, 1958 in its bank in Omaha,[7] and by reason of admissions made by John F. Futcher, an official of Woodmen, "when questioned at the hearing held on Sept. 29th before this Court as to whether Woodmen considered the lease forfeited * * *." Neither of the grounds, in our opinion, has validity.

It appears, therefore, from examination of the court's findings that Ludman failed to pay taxes due for the year 1957 and payable in July, 1958; and that on July 10, 1958, Woodmen sent a written notice to Ludman, which it received July 14th, stating that unless the taxes were paid and the outstanding tax certificate redeemed within sixty days after receipt of the notice, the lease would be immediately forfeited. Ludman's failure to pay the taxes made the forfeiture complete on September 12, 1958, and it

6. The controlling terms of the lease are these:

"The Lessee agrees as additional rent to pay and discharge promptly when due and payable, all and every, * * * tax and taxes, * * * and all other charges assessed upon or against the Demised Premises and the buildings and improvements thereon, * * * and it is further agreed that should the Lessee fail to promptly pay said taxes * * * herein by it covenanted to be paid, the Lessor may, but it shall not be obligated to, pay the same * * *.

"In the event the Lessee shall fail to pay the rent when due, as herein set forth, or in the event the Lessee shall violate any of the other covenants herein contained, or in the event the Lessee shall be adjudicated a voluntary bankrupt, or in the event the Lessee shall be adjudicated an involuntary bankrupt, * * * or in the event the Lessee * * * shall fail to pay such rent or correct such violation, as herein provided, and after notice as herein provided, this lease and the term hereof shall, upon the date specified in the written notice from the Lessor to the Lessee, wholly cease and determine, with the same force and effect as though

the date so specified were the date hereinabove first set forth as the date of expiration of this lease; and thereupon and without notice, the Lessor may re-enter said premises, either by force or otherwise, * * * it being understood that no demand for the rent and no re-entry for condition broken as at common law and no notice to quit possession as prescribed by statute shall be necessary to enable Lessor to recover such possession, but that all right to any such demand and any such re-entry and any such notice to quit possession or other statutory notices or prerequisites are hereby expressly waived by the Lessee. * * *"

The lease further provides for sixty days written notice of default or of any breach except as to rent, with respect to which a thirty day notice of default is provided.

7. Which checks, when presented for payment, were dishonored because of the pendency of litigation. They did not, therefore, constitute payment. Colonial Life & Accident Insurance Co. v. Wilson, 5 Cir., 1957, 246 F.2d 922; and Carcaba v. McNair, 5 Cir., 1934, 68 F.2d 795.

was this termination which led the court to state the conclusion quoted above to the effect that Woodmen had then an absolute right to take possession. In the meantime Ludman had failed to pay the rent for August, due August 1st, and the rent for September, due September 1st, and Woodmen sent out additional notices that the lease would be forfeited unless these rental payments were made within thirty days.

This procedure was entirely sound under the terms of the lease and could not, in our opinion, vitiate or modify the prior notice concerning default in the payment of the taxes. This tax notice would not accomplish the termination, under the terms of the lease, until September 12th, and the two demands the court referred to covered rent due before the forfeiture was complete and at a time when Ludman's occupancy of the premises was regular and a matter of right. The July 10th tax notice did not have the effect of absolving Ludman from the obligation of paying August and September rent. These facts are undisputed and we think that the court reached an erroneous conclusion as to their legal effect.

■ The same is true as to the testimony of Futcher, which was given under these circumstances. The petitioning creditors had filed the Chapter 10, proceedings on September 18th, six days after the forfeiture had become complete, and the court was, on September 29, 1958, hearing their petition and objections thereto. The creditors called Futcher, who was under subpoena, as their witness. Woodmen had filed no pleading, no trustee had been appointed, and nothing was on file except the petition of three creditors praying that the court proceed with reorganization, as provided by said Chapter 10. Futcher was not in Miami, where court was being held, for the purpose of testifying.

He testified that he had that morning been advised by Woodmen's home office in Omaha, Nebraska that two rent checks had been received. He was asked if he knew whether Woodmen would cancel in view of the receipt of the checks and he replied that if the checks were paid, there would be no default with respect to the two months' rent covered by them. He stated positively that the notice of nonpayment of taxes had been served in July, and then the examination was plunged into the confusion attendant upon the fact that questions were asked concerning more than one piece of property. Thereupon the witness was further cross examined by Ludman's attorney and made the answers which are reproduced in the margin,[8] upon which the Trustee places

8. "Q. How long has Woodmen of the World had this lease? A. Since 1953.

"Q. Have you ever had any defaults in existence between Ludman and your company since 1953? A. No, not to my knowledge.

"Q. When did the first default occur? A. For non-payment of—

"Q. Rent? A. —of the taxes, and non-payment of the August rent.

"Q. That is the first default sir? A. That is the first time that we served a notice of default.

"Q. Is your company seeking to cancel this lease? A. Well, we would—I think our preference is to have our rent paid, regularly. We have no—

"Q. Then the service of this notice is strictly something done to technically comply with the provisions of a lease agreement; is that right?

"Mr. Harold Friedman: If Your Honor please, I object to that. I think the notice speaks for itself, if the man hasn't paid the rent. Introduce it into evidence.

"Mr. Kanner [attorney for Ludman who was questioning the witness]: If the Court please, in their petition they allege imminency of the cancellation.

"Mr. Harold Friedman: It was imminent until you paid your rent.

"Mr. Kanner: That is what you think.

"The Court: Will you read the question?

"The Court: I will overrule the objection. Do you understand the question?

"The Witness: Yes, sir.

"The Court: All right, go ahead and answer.

"A. The notice was served to enforce compliance with the lease."

greatest reliance and which the court below presumably used as the basis of its findings.

We find nothing in the testimony of this witness tending to support the charge that he was stating that Woodmen was withdrawing the notice concerning nonpayment of taxes or was in fact withdrawing or waiving anything. The whole colloquy had reference to the two checks about which the witness had learned that morning. He correctly answered that if the checks were paid, Woodmen had no alternative except to accept the payment of the rent, which would cancel the two notices of default in rent payment. That rent was due even though the default arising from nonpayment of taxes should become effective September 12th.[9] Even, therefore, if the witness in this summary and informal examination had any authority to waive any of Woodmen's rights, we find nothing in his testimony to support the conclusion of the court below that the forfeiture resulting from nonpayment of taxes and the sixty day notice was waived or in any degree modified or relinquished.

The fact is that Woodmen's every action showed quite the contrary. October 17th, three days after the Trustee qualified, it filed its petition for an order directing that the Trustee surrender the Ludman premises to it.[10] When advised that the Trustee was applying to the court for instructions with respect to a proposed lease of the property to Airtek Dynamics, Inc., Woodmen filed a prompt objection to the granting of such an order. Upon learning that the Trustee was taking the position that Woodmen

was not the owner of the premises, it filed a prompt and full response setting forth in detail the facts relied upon by it as establishing its complete ownership. At the beginning of the hearing by the court below upon these matters Woodmen filed suggestions to the court as to the findings of fact and conclusions of law which should be entered vouchsafing to Woodmen all of the rights it had asserted. All of this was done prior to the entry of the order by the court on December 15, 1958, and Woodmen appealed promptly from that order and then pursued the hearing on the merits, which began in April, 1959 and concluded with the order of June 30, 1959, and it appealed from that order.

Even if the court's action in declining to give effect to the termination of the lease by lessee's nonperformance were not erroneous under the foregoing reasoning, it would be clearly erroneous because of the complete absence of tender of the payments in default [11] and of proof that they could, or would, be made.[12] The Trustee was content, in his opposition to Woodmen's prayer that the premises be turned over to it, to offer, subject to court approval, that such payments be made.[13] We find no indication that the court ever took any step to make said offer effective.

In its order of December 15, 1958, the court rejected the objections of Woodmen to the plan for interim operation, denying for the time being Woodmen's request that the premises be turned over to it and denying also until some future date to order any accounting as between the Trustee and Woodmen respecting the continued use of the prem-

9. Cf. Wagner v. Rice, Fla.1957, 97 So.2d 267.

10. This petition was followed by an amendment praying for an order that the Trustee be directed to pay a reasonable compensation for the use and occupancy of the premises and for other relief.

11. Mayflower Associates v. Elliott, Fla. 1955, 81 So.2d 719; Rader v. Prather, 1930, 100 Fla. 591, 130 So. 15.

12. See footnote 14 infra.

13. " * * * this defendant as Trustee offers in this court of equity, subject to the permission and order of the Court, to pay all amounts in arrearage, if any arrearages there are, together with either the rental payments from the time of September 18, 1958 or such use value rent determination as the Court may fix and determine."

ises. The same order tentatively approved a "sublease" to Airtek Dynamics, Inc. or "to anyone else who may submit a similar plan" for one year beginning January 1, 1959. The court further entered its order of June 30, 1959 denying the petition and the amendment of Woodmen that the premises be turned back to it, and that the Trustee be directed to pay reasonable compensation for the use and occupancy of the premises and to account to Woodmen for all of the rents received from Sonken-Galamba Corporation, a sublessee whose business was not connected with that of Ludman. Neither order made any provision for reimbursing Woodmen the sums it had been forced to pay out for taxes, or for payment of the rent past due at the time these proceedings were instituted, or compensation for the use of the premises during that extended period. All the while Woodmen was enjoined from canceling the lease.

Statements made in pleadings of the Trustee and in the orders of the court indicate considerable doubt whether funds would be available to make Woodmen whole with respect to the circumstances outlined. The Trustee reported a few days after his qualification that there were about fifteen hundred creditors, some of whom held warehouse certificates on a great portion of the inventory; that a New York corporation held a chattel mortgage of $400,000.00 in addition to assignment of accounts receivable of approximately one million dollars; that the United States had filed secured tax claims in the approximate amount of $360,000.00; and that labor claims aggregated approximately $125,000.00, so that there were "no free funds in sufficient amounts to justify the Trustee to go back into operation." [14]

It is clear, therefore, that the court below correctly found that the lease was terminated as of September 12, 1958, and that Woodmen, owner of the premises, had the right to have said premises surrendered to it. These findings were, by its terms, made a part of the court's order of June 30, 1959, and said findings and action are approved and affirmed upon the Trustee's appeal therefrom. It is equally clear that the court erroneously found that Woodmen had waived, or had been estopped to assert its right to demand surrender of the premises as of September 12, 1958.

Upon the appeal of Woodmen, the orders entered by the court below dated December 15, 1958 and June 30, 1959 are reversed and the cause is remanded for the hearing of Woodmen's petition filed October 17th and the amendment filed December 1, 1958, and for further action by the court below in consonance with the views expressed in this opinion.

Affirmed upon the appeal of the trustee and reversed and remanded upon the appeal of Woodmen.

14. Appended to one of Woodmen's briefs is copy of an order dated October 2, 1959, prior to submission of the case to us,—unchallenged by the Trustee—from which it appears that Ludman Corporation was adjudged bankrupt pursuant to Section 236(2) of the National Bankruptcy Act and the entire matter referred to a referee, and that a receiver had been appointed—all after the court had availed itself of the aid and counsel of the Securities and Exchange Commission and had rejected all plans for Chapter Ten reorganization.

In connection with these undisputed showings it is pertinent to consider the statement of general principles of grounds for denying relief against forfeiture by a court of equity as set forth in 32 Am.Jur., Landlord and Tenant, § 896, pp. 759–760:

"Relief from a forfeiture of a lease will be granted only under a strong expectation that the tenant's covenants will be faithfully performed thereafter. Therefore, the insolvency of a tenant is a proper ground for refusing against a forfeiture, where his solvency is necessary to the due performance of his covenants. This is particularly true where it appears that the rent is long past due, that there is no tender of the amount in arrears, and that other liens are being asserted against the tenant's property. As a condition precedent to relief from a forfeiture for nonpayment of rent, all arrears of rent, with interest and costs, must be paid or tendered."