OPINION OF THE COURT
James J. Brucia, J.
This litigation arises as a result of plaintiff, Government Employees Insurance Company (Geico), instituting the within declaratory judgment action that there was no policy of automobile liability and physical damage with collision coverage in effect on December 21, 1990 covering a 1987 Nissan owned by defendant Anita Solaman (Solaman).
On December 21, 1990 the defendant Henry A. Heuer (Heuer) operating his vehicle and defendant Bernadette Apanah (Apanah) operating Solaman’s 1987 Nissan were involved in a motor vehicle accident. In underlying actions in Supreme Court, Queens County (index Nos. 1042/91, 10986/91) defendants Heuer and defendants Zelda R. Mabry and Edric G. Lewis have instituted lawsuits against defendants Apanah and Solaman for personal injuries sustained in the December 21, 1990 motor vehicle accident.
Prior to December 21, 1990, Geico insured Solaman under its policy No. 383-42-59. The inception date of that policy of automobile liability and physical damage for the 1987 Nissan owned by Solaman was November 23, 1989. In November 1990, Geico mailed a notice to renew the contract of insurance, effective November 23, 1990 to May 23, 1991 requesting payment of $274.24 by November 23, 1990. Receiving no response to said notice, on December 4, 1990 Geico mailed a notice of policy cancellation dated December 4,1990 to become effective 12:01 a.m. on December 20, 1990, unless the mini *739 mum premium amount due of $409.86 was paid within 15 days.
Solaman contends that on December 17, 1990 she mailed a payment check in the amount of $409.86 to Geico. Geico contends the check was not received by Geico until after December 20, 1990 and therefore the policy was cancelled effective 12:01 a.m. December 20, 1990.
PLEADINGS
The pleadings reflect that plaintiff Geico seeks "an order and judgment decreeing that it issued no policy of insurance to Anita Solaman in effect on the date of the accident (December 21, 1990) involving the 1987 Nissan” owned by defendant Solaman, together with costs and disbursements.
Defendants Solaman and Apanah in their answer interpose denials and assert as an affirmative defense that plaintiff Geico issued a policy No. 383-42-59 for the period May 23, 1990 to November 23, 1990 to defendant Solaman and that the renewal premium for said policy was paid by check on December 17, 1990 which check was deposited by Geico on December 31, 1990 and cleared defendant Solaman’s bank on January 2, 1991.
In addition, defendants Solaman and Apanah assert three counterclaims seeking money damages, costs and assessments.
The first counterclaim is for breach of policy coverage in that plaintiff Geico failed to pay or defend the claims made by codefendants herein, Henry A. Heuer and Mary D. Heuer (Heuer), arising from the automobile accident on December 21, 1990. This disclaimer forced defendants Solaman and Apanah to retain independent counsel to provide a defense and defendants Solaman and Apanah may become liable in damages to codefendants Heuer and other codefendants herein, Zelda R Mabry and Edric G. Lewis, in the personal injury actions pending in Supreme Court, Queens County.
The second counterclaim is in negligence in failing to timely credit the premium to the proper account, causing the purported cancellation of the Solaman policy.
The third counterclaim is for the property damage collision coverage benefits under the Solaman policy covering the 1987 Nissan vehicle involved in the accident.
Defendants Heuer in their answer interpose denials and affirmative defenses seeking dismissal of plaintiff Geico’s complaint, together with costs and disbursements.
*740 Defendants Zelda R. Mabry and Edric G. Lewis have not appeared in this proceeding. Whether said defendants have been served with the summons and complaint in the within action and defaulted in appearance is not known.
Prior to the commencement of trial, the parties stipulated on the record that Geico’s notice of policy cancellation dated December 4, 1990 conformed with the 12-point type requirements to take effect on December 20, 1990 at 12:01 a.m.
issue
Was the premium payment tendered by Solaman by mail timely made to Geico so as to render the contract of insurance in full force and binding upon Geico as of December 21, 1990, the date of the motor vehicle accident?
DECISION
After a bench trial based on the evidence, testimony and exhibits and after a review of the posttrial memoranda, the court finds that the premium payment was timely made and that Geico’s contract of insurance was in effect as of December 21, 1990 for the following reasons:
The testimony of defendant Solaman that she mailed to Geico her check dated December 17, 1990 in the amount of $409.86 at the Flushing, Queens main post office on December 17, 1990 at about 6:30 p.m. in the evening by taking the letter into the post office which was open late stands unimpeached and uncontradicted.
Plaintiff Geico has offered no direct evidence to controvert Solaman’s testimony that her check was mailed December 17, 1990 three days before the intended date of cancellation on December 20, 1990. Instead, the testimony of Debbie Dixon the director of Geico’s remittance center at the Geico Plaza location in Washington, D.C. was offered to establish Geico’s procedures, when the check was received and processed by Geico. She testified that she could not give a specific date when the check was received and that her department, consisting of a staff of 33 people, receives approximately 100,000 payments a day. Also, that no record was maintained of scanning the envelopes or the postmark date on the envelopes transmitting the checks which parenthetically could establish if the payment was placed in the mail before or after the date of intended cancellation. She testified on direct that by comparing the check in question with two other checks processed *741 and deposited at the same time, she concluded the Solaman check was received approximately on the 28th or 29th of December and on cross-examination she testified that the Solaman check was received either December 29th or December 31st then processed on December 29th or December 31st and posted to Solaman’s account on January 2, 1991.
None of the foregoing testimony is persuasive in establishing whether Solaman mailed her payment check before or after the date of intended cancellation, since no record was maintained by Geico based on the scanning of the envelopes and the postmark date of mailing indicated thereon. Also, the testimony is not even persuasive as to the date the Solaman check was received by Geico.
The court notes that despite the lack of procedures in place for this phase of Geico’s business (collection of renewal premiums) to record or retain the envelopes containing the renewal premium payments with the postmark date of mailing thereon, Geico evidently for other purposes in other of its departments, did indeed utilize the postmark date on return envelopes when Geico desired to establish the effective date of initial policy coverage when dealing with new business. Yet, on renewal policies and renewal premium payments, no such envelope or postmark procedure was in place.
The Notice of Policy Cancellation for nonpayment of premium dated December 4, 1990 effective as of 12:01 a.m. standard time December 20, 1990 informed the insured Solaman: "Pursuant to Section 3425 of the New York Insurance Law payment of the Minimum Premium Amount Due ($409.86) within 15 days after mailing of this notice will automatically continue your insurance. Checks * * * are accepted subject to collections only. To speed processing please pay installment or premium due.”
Section 3425 (a) (10) of the Insurance Law defines "Nonpayment of premium” as follows: " 'Nonpayment of premium’ means the failure of the named insured to discharge any obligation in connection with the payment of premiums on a policy of insurance or any installment of such premium, whether the premium is payable directly to the insurer or its agent * * * Payment to the insurer * * * shall be timely, if made within fifteen days after the mailing to the insured of a notice of cancellation for nonpayment of premium”. (Emphasis added.)
The statute is silent as to how "Payment to the insurer” is *742 made. Plaintiff Geico contends "Payment to the insurer” is made when the insurer receives the payment. Defendant Solaman contends "Payment to insurer” is made when the premium payment is mailed or posted.
The offer to renew the contract of insurance mailed by Geico in November 1990 as well as the Notice of Policy Cancellation dated December 4, 1990 were offers to renew the prior policy expiring November 23, 1990 for an additional six-month period. By the insurer’s offer, forwarded by mail and enclosing a self-addressed envelope for the return of the premium payment, Geico designated the method of acceptance, i.e., by regular mail and not overnight or next day delivery. The well-established rule (the "Postal Acceptance Rule”) is that in the absence of any limitation or provision to the contrary in the offer, the acceptance of the offer is complete and the contract becomes binding upon both parties when the offeree (Solaman) deposits the acceptance by the payment of premium in the post office. Here the testimony was that envelope containing the premium payment was delivered to a main post office open for business on December 17, 1990, before the date of intended cancellation.
The burden of producing evidence that the offer of renewal sent by Geico contained a provision limiting the operating of the "Postal Acceptance Rule” was upon Geico as the plaintiff in this declaratory judgment action. No evidence in this regard was produced.
Geico opted not to keep or scan premium payment transmittal envelopes indicating postmark mailing dates. Nevertheless, Geico’s notices to their insureds must be read and interpreted literally. "Payment of the Minimum Premium Amount Due ($409.86)”. How? By regular mail "within 15 days after mailing of this notice will automatically continue your insurance.” No other limiting provisions are stated and the insured complied.
The "Postal Acceptance Rule” dates back to Adams v Lindsell (1 Barn & Ald 681, 106 Eng Rep 250 [1818, Kings Bench]) and has been generally accepted in most jurisdictions throughout the United States. (For a comprehensive review of the authorities and reasoning for the rule listing most United States jurisdictions, see, Morrison v Thoelke, 155 So 2d 889 [Fla App 1963].)
In 14 Appleman, Insurance Law and Practice (§ 7990, at 410-413 [1985 rev ed]), it is stated:
*743 "The effect of mailing a premium, as regards payment, depends wholly upon the intention of the parties. While, generally, payment of a premium would not be effected until actual receipt by the insurer, where the insurer or its authorized agent requests or directs payment by mail, it is paid when such premium is deposited in the post office * * *
"Where the insurer invites the insured to forward a premium through the mails, the government becomes the agent of the insurer for the purpose of transmitting the premiums”.
3 Bouvier’s Law Dictionary and Concise Encyclopedia 2540-2542 (Rawle’s 3d rev, 8th ed, 1914) defines "payment” as:
"The fulfillment of a promise, or the performance of an agreement.
"The discharge in money of a sum due.
"It implies the existence of a debt, of a party to whom it is owed, and of a satisfaction of the debt to that party * * *
"The word payment is not a technical term: it has been imported into legal proceedings from the exchange [i.e., the Rules of Commerce from Law Merchant], and not from law treatises * * * and in the case of an insurance premium, such premium is held to be paid when the letter containing it is deposited in the postoffice, addressed to the company; McCluskey v. Nat. L. Ass’n, 77 Hun 556, 28 N. Y. Supp 931 [affd without opn 149 NY 616 (1896)].”
"Although the postal acceptance rule appears to be a vestigial survival of the 'subjective’ theory of the formation of contracts held by the common law judges in England at the close of the Eighteenth Century and the beginning of the Nineteenth Century [in the United States], the rule is too well established by authority to be abandoned now. Indeed, Professor Corbin, after reviewing the logical difficulties which the rule presents and the considerations of policy for and against the continuation of the rule, concludes that it is probably wiser to continue it. He aptly stated in 1 Corbin, § 78, page 337: 'One of the parties must carry the risk of loss and inconvenience. We need a definite and uniform rule as to this. We can choose either rule; but we must choose one. We can put the risk on either party; but we must not leave it in doubt. The party not carrying the risk can then act promptly and with confidence in reliance on the contract; the party carrying the risk can insure against it if he so desires. The business community could no doubt adjust itself to either rule; but the rule throwing the risk on the offeror has the merit of *744 closing the deal more quickly and enabling performance more promptly. It must be remembered that in the vast majority of cases the acceptance is neither lost nor delayed; and promptness of action is of importance in all of them. Also it is the offeror who has invited the acceptance.’ ” (Reserve Ins. Co. v Duckett, 249 Md 108, 118, 238 A2d 536, 541-542.)
As long as Geico as the insurer authorized the payment of premium by mail, the premium due is considered paid when the insured deposits the premium payment in the mails. (McCluskey v National Life Assn., 77 Hun 556 [3d Dept], affd without opn 149 NY 616 [1896], supra; Primeau v National Life Assn., 77 Hun 418 [4th Dept], affd without opn 144 NY 716 [1895].) The fact that these cases appear to have not been cited recently does not militate against the soundness of the rule of law enunciated with approval by the Court of Appeals. The "Postal Acceptance Rule” is firmly established in the common law of New York.
The court rejects Geico’s contention that section 3425 of the Insurance Law, pursuant to which provision the notice of policy cancellation was sent, means receipt by the insurer of the premium prior to the cancellation date and not the mailing date the insured forwards the premium.
Cardinal rules of statutory construction state:
"A change in long established rules of law is not deemed to have been intended by the Legislature in the absence of a clear manifestation of such intention.
"The courts presume that a radical change in the common law by statute will be expressed with the clearness which the importance of the subject demands, or so that its meaning is unmistakable, especially when the change affects * * * rules of liability. The courts will not construe a statute as abolishing a common-law right in the absence of a clear intention on the part of the Legislature * * *
"This principle is analogous to the doctrine that statutes in derogation of the common law are to be strictly construed.” (McKinney’s Cons Laws of NY, Book 1, Statutes § 153, at 331-333.)
The court has reviewed the Insurance Law carefully to ascertain the Legislature’s intention in this regard without success. Nor has counsel for Geico alerted the court to any provision in existing applicable statutory legislation or legislative history to warrant the abandonment of the "Postal Acceptance Rule”, so strenuously urged by Geico.
*745 Upon a further and separate ground, the court finds Geico’s position of no coverage on December 21, 1991 totally untenable under the circumstances of this case.
Geico’s witness testified:
"[0]ur system is set up so that any money that is posted to any account that is cancelled generates a kick out from our system, which goes to the accounts receivable area the next day, and then they research as far as for reissue purposes.
"Q. Was there a kick out in your system?
"A. Yes, it was because our T’ log records * * * 'P’ log is a system that we record information concerning the policy. And we set that up so that our service counselors could better serve our customers. So, it’s for anybody to see, anybody can access it. And our 'P’ log indicates that on January 2, 1991 the policy was re-issued the same date that the money [was] posted to the account. ” (Emphasis added.)
On this record it appears that Geico kept its insured without liability and property damage coverage from Geico’s purported cancellation date of December 20, 1990 to January 2, 1991 until Geico was paid and then reissued policy coverage. There was no testimony by Geico that it ever refunded to the insured the pro-rata premium for the 14 days the insured was presumably left without coverage. None of Geico’s exhibits disclose such refund either. Neither Geico’s testimony nor its exhibits explain how Geico applied the $409.86 it received from Solaman.
There can be no question that had Solaman’s payment of $409.86 been received and processed by Geico before the purported cancellation date of December 20, 1990, that premium payment clearly would have uneventfully paid for Solaman’s insurance from renewal date of November 23, 1990 to the next installment due date of the policy some time in February or March of 1991, with uninterrupted valid insurance coverage for Solaman on December 21,1990.
Since Geico contends Solaman’s payment of $409.86 was received and processed by Geico after the purported cancellation date of December 20, 1990, Geico to be consistent with its position should have computed the earned premium on Solaman’s policy from November 23, 1990 through December 20, 1990 (a period of 28 days), credited Solaman in that amount and refunded to Solaman the balance remaining from the $409.86 Geico received on January 2, 1991. Manifestly the earned premium for 28 days cannot amount to $409.86.
*746 Instead of communicating with Solaman, Geico posted $409.86 to Solaman’s account and reissued the policy on January 2, 1991 thereby creating greater confusion to the detriment of its insured Solaman and to the public at large. Was the policy reissued for an undisclosed term effective January 2,1991? Was the policy coverage period from November 23, 1990 to December 20, 1990 thereafter lapsed until January 2, 1991 and then reinstated? If so, to what date? Geico chose to keep the premium payment and inform no one of its course of conduct.
In this day of compulsory automobile liability insurance, designed for the protection of insureds and the innocent public, such conduct of an insurer, unilaterally suspending insurance coverage and arbitrarily without notice reinstating coverage after the occurrence of an accident cannot be condoned. Having accepted the premium payment without accounting to its insured as to how the premium would be applied, Geico is estopped from now claiming the lapse in coverage. (See, Wiener v Government Empls. Ins. Co., 52 AD2d 844; Linser v Allstate Ins. Co., 50 Misc 2d 989.)
Accordingly, plaintiff Geico’s action for declaratory judgment is dismissed. Costs and disbursements are awarded to all appearing defendants herein.
In addition, judgment will be entered herein declaring that defendant Solaman’s automobile liability and physical damage policy with Geico (renewal policy No. 383-42-59) was in full force and binding upon Geico as of December 21, 1990, the date of the motor vehicle accident.
Plaintiff Geico is directed to defend and indemnify defendants Solaman and Apanah to the extent of its policy limits from any and all claims against each of said defendants arising out of the automobile accident sustained in Queens County on December 21, 1990.
In addition, plaintiff Geico is directed to accept and process defendant Solaman’s physical damage collision claim under said policy.
The court will now address the status of defendants Solaman and Apanah’s three counterclaims, in view of the foregoing ruling on the declaratory judgment action. Defendants Solaman and Apanah’s first, second and third counterclaims have been addressed and are subsumed in the declaratory judgment rulings, except for that branch of the first counterclaim, paragraph 8, "That as a result of plaintiff’s failure to *747 provide a defense and insurance coverage * * * defendants * * * have suffered harm in that they had to retain an attorney and to provide a defense on their own behalf’.
The transcript of the trial at page 50 indicates that after all sides rested, plaintiff’s attorney moved to dismiss the counterclaims asserted by defendants Solaman and Apanah. Thereafter, the attorney for defendants Solaman and Apanah, after opposing the motion to dismiss, stated:
"Also, your Honor, I believed I would be entitled to attorney’s fees if my clients should prevail * * *
" If your Honor wishes, I will be more than happy to provide a brief on this.”
On page 53, the court stated: "All right. I will continue this. I will give you an opportunity to submit your briefs.” All parties subsequently submitted briefs.
It is clear from the foregoing that the court reserved decision on the entire case, would consider defendant’s application for attorney’s fees on the declaratory judgment action and would continue the trial, if necessary, with respect to said defendants’ legal costs, if any, incurred to retain independent counsel to provide a defense to the underlying tort action, in view of plaintiff Geico’s disclaimer of coverage.
"An insured is entitled to recover the expenses of defending a declaratory judgment [action] brought as a result of an insurer’s breach of its obligation to defend a tort action related to its disclaimer (Johnson v. General Mut. Ins. Co., 24 NY2d 42, 50).” (Glens Falls Ins. Co. v United States Fire Ins. Co., 41 AD2d 869, 870, affd on opn below 34 NY2d 778.)
"It is the rule in New York that such a recovery may not be had in an affirmative action brought by an assured to settle its rights * * * but only when he has been cast in a defensive posture by the legal steps an insurer takes in an effort to free itself from its policy obligations (see Johnson v General Mut. Ins. Co., [supra]; Glens Falls Ins. Co. v United States Fire Ins. Co., [supra]). Essentially, the latter cases find support in the theory that an insurer’s responsibility to defend reaches the defense of any actions arising out of the occurrence.” (Mighty Midgets v Centennial Ins. Co., 47 NY2d 12, 21.)
It appears from defendants Solaman and Apanah’s trial memorandum with attached affirmation of services dated October 19, 1992 that "Plaintiff Geico has provided a defense to this underlying [tort] action with a reservation of rights”. Yet neither plaintiff’s counsel nor Solaman and Apanah’s *748 counsel, in their respective pleadings or at the trial chose to so inform the court.
Under the circumstances, the court declines to award defendants Solaman and Apanah any legal fees allegedly incurred for the defense of the underlying tort action. However, with respect to the legal fees and expenses incurred by said defendants for the defense of the within declaratory judgment action, such fees and expenses will be reviewed and considered by the court.
Instead of responding to the proffered affirmation of services by disputing either the hourly rate or the time expended should the court rule in favor of the defendants, Solaman on this issue, the plaintiff, in his reply brief, relies only upon a procedural objection that "Counsel rested at the time of the trial without one bit of proof in support of the counterclaim.”
In view of the status of the record previously stated herein, the court reduces the total hours expended from 17% hours (correctly added to be 18% hours) to 15 hours and awards the defendants Solaman and Apanah the sum of $3,146.58 for their legal fees and expenses incurred in the defense of plaintiff Geico’s declaratory judgment action.