RESERVE INSURANCE COMPANY *v.*
DUCKETT, ET AL.

[No. 109, September Term, 1967.]

*Decided February 27, 1968.*

The cause was argued before HAMMOND, C. J., and HOR-
NEY, BARNES, McWILLIAMS and SINGLEY, JJ.

*Milton A. Kallis,* with whom were *Bond L. Holford* and *Donald J. Caulfield* on the brief, for appellant.

*Leon Shampain,* with whom were *Vaughan & Shampain* on the brief, for George Francis Duckett, one of appellees; *William E. Brannan, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for Unsatisfied Claim and Judgment Fund Board, another appellee; submitted on brief by *Barbour & Zverina* for Samuel G. Cornblatt and Celeste Carp Cornblatt, other appellees; and by *Sasscer, Clagett, Powers & Channing,* for Nationwide Insurance Co., other appellee.

BARNES, J., delivered the opinion of the Court.

This case presents a second appeal by Reserve Insurance Company (Reserve), the plaintiff below and appellant in this Court, which had filed an action at law for a declaratory judgment in the Circuit Court for Prince George's County against Reserve's policyholder George Francis Duckett (Duckett), one of the appellees, to determine whether its policy covered an accident occurring on September 7, 1961, at approximately 6:05 p.m. between the motor vehicle operated by Duckett and a vehicle operated by Samuel G. Cornblatt and owned by Celeste Carp Cornblatt. The Cornblatts were also parties defendant individually, and Celeste Carp Cornblatt to her own use and to the use of Nationwide Mutual Insurance Company (Mrs. Cornblatt's insurance carrier) was also a party defendant. The Unsatisfied Claim and Judgment Fund Board (the Board) later intervened and was made a party defendant. Nationwide and the Board are the other appellees.

In the first appeal, *Reserve Insurance Company v. Duckett,* 240 Md. 591, 214 A. 2d 754, decided on December 7, 1965, we remanded the case without affirmance or reversal in accordance with Maryland Rule 871 a, so that additional evidence could be taken in the trial court on whether the Davis & Davis Insurance Company (Davis) had apparent authority to bind Reserve on the policy, or was an agent by estoppel, and whether Reserve was bound by the insurance policy to defend Duckett

in the pending action and to pay any judgment recovered against him up to the limits of the policy.

At the trial on the remand the parties, at the close of all of the evidence, waived a jury verdict and, by agreement, referred the evidence taken to the trial court for determination. The trial court (Bowie, J.) made findings of fact and signed an order declaring that Reserve must defend Duckett in the pending Cornblatt case, pay any judgment recovered against him up to the policy limits, and that, so far as the Board was concerned, Duckett was and is an insured motorist with respect to the accident.

The facts are interesting and substantially undisputed. Duckett, in 1958, had an automobile accident, one result of which was that he had to obtain insurance pursuant to the provisions of Code (1957), Article 66½, Section 122 which generally requires the obtention of security following an accident unless there is evidence of insurance. Shortly after that accident Duckett received a letter from Davis in which it was stated that it would insure him. Duckett went to the Davis office in Baltimore and Davis obtained insurance for him through the Leonhart Agency for a Maryland Form SR22 compliance from American Security Insurance Company, effective July 31, 1959. On that day an SR22 form was filed with the Maryland Department of Motor Vehicles certifying that Duckett had obtained the necessary insurance.

Davis acted as an insurance broker and also as an insurance agent for fifteen companies, Reserve not being one of those fifteen companies.

The St. Paul Agency, Inc. (St. Paul), which had offices in Baltimore City, was the insurance agent for Reserve in Maryland duly authorized to write policies for Reserve under an oral agency which did not prohibit St. Paul from establishing branch offices or agencies in Maryland. Reserve issued blank policies in quantity to St. Paul, which signed a number of these policies in blank as "authorized Representative" and gave them to Davis to issue directly to an insured. Davis accounted to St. Paul monthly for premiums for the policies of Reserve thus issued by it. On these Reserve policies, already signed by St. Paul as we have indicated, Davis typed "Davis & Davis" under the word "Agent" at the top right hand side of the policy, just opposite

the typed in name of the "named insured and address." In addition to the typed name of "Davis & Davis" under the word "Agent," a red and white gummed label with the notation "Davis & Davis INSURANCE," with the address and telephone number, was pasted under the word "Agent."

Duckett, who was a farm laborer, living at Croom in Prince George's County, had dealt with Davis for several years. Called as a witness for the plaintiff, Reserve, he testified that the usual way he dealt with Davis in paying premiums was either to carry cash or send money orders. He testified that he considered Davis to be the agent for Reserve because he had paid his money to Davis and Davis had "always issued me the policy." In March, 1961, Davis issued a Reserve combination automobile policy with policy limits of $10,000 for each person and $20,000 for each accident for bodily injury liability and $5,000 for each accident for property damage liability. Under the heading "Policy Period" there is typed "(6 Months)" and the words "From March 7, 1961 To September 7, 1961" followed by the printed words "12:01 A.M. standard time at the address of the named insured as stated herein." This policy, although dated and effective March 7, 1961, was issued by Davis on March 9, 1961, as appears opposite the words "Date of Issue" on the policy.

In accordance with the usual practice, Davis sent Duckett a letter 30 days prior to the expiration of the Reserve policy with a request for payment of a renewal premium, and, payment not having been received, another letter of the same nature 15 days prior to the expiration of the Reserve policy. Self-addressed envelopes were enclosed in these letters for the use of the insured in making payment of the renewal premium. Duckett was uncertain in regard to the exact time he mailed the money order for the premium, prior to the expiration date of the Reserve policy, stating "I would say four or five days." He also testified that theretofore the policy would be sent to him by Davis the day or day after he had sent the money for it, the longest period of time being "not more than three days."

Duckett had an accident, as we have indicated, on September 7, 1961, at approximately 6:05 p.m. He went to the Davis office in Baltimore City the following day, September 8, to report the

accident. He spoke to a Mrs. McAllister, the underwriter for Davis, and explained the happening of the accident to her. She told Duckett that "she would file it with Reserve Insurance." He inquired of Mrs. McAllister as to whether he was covered at the time of the accident and she told him that he was covered.

Meyer Davis, one of the partners of Davis & Davis, called as a witness for the plaintiff, Reserve, testified in regard to sending the 30 day and 15 day letters already referred to, but stated that he did not retain copies of those letters. He stated that they were "form" letters, but no copy of the "form" or other evidence showing the precise language of those letters was introduced into evidence. He testified that for this class of business he operated on a cash basis and that Duckett was a "good payer," and was "all right." On September 8, 1961, a policy in the same form as the March 7, 1961, policy and marked as a "Renewal" of the March 7, 1961, policy (the March 7 policy was marked "New") was issued. The figures "12:01" were stricken out and the figures "10:00" were inserted on the typewriter. The renewal policy was also a six month policy ending March 8, 1962. The date of issuance was also given as September 8, 1961. Mr. Davis could not recall any instance in which a renewal policy did not take effect immediately upon the expiration time of the expiring policy and stated that a renewal policy "should" do this. He stated that one-half of the Davis business was of sub-standard production and that the Reserve business was about one-half of his volume in that area. Davis had written a total of 1011 Reserve policies in the period 1960 to 1962. Mr. Davis admitted that it took time to issue policies and that apparently it had taken the Davis staff two days to issue the new Reserve policy to Duckett as it was effective on March 7 but was issued on March 9, 1961. In that case, the Davis records indicated that Duckett had paid the premium on March 3, 1961. The envelope in which Duckett sent the money order for the renewal premium was not kept.

Although he did not open the mail, Mr. Davis testified that the policy was issued on "September 8th, the day we received the money."

Kenneth Francis Cook, vice-president of Reserve in charge

of sales, testified that St. Paul was the agent of Reserve and that Reserve supplied policies to the St. Paul Agency which had authority to bind Reserve, issue policies and issue SR22 financial responsibility certificates. There was no written agreement between Reserve and St. Paul and the agency was terminated by Reserve on March 13, 1962. He testified that Reserve "didn't care how many branch offices or places of business they [St. Paul] had;" it would be perfectly possible that St. Paul could have an office in every section of Baltimore and that the St. Paul Agency was terminated because of "adverse loss rates and credit problems." He stated that as long as Reserve was getting premiums in the Baltimore area, Reserve was not paying any attention to whose name appeared on the policy, although a copy of the policy was returned to the home office. He further stated that he presumed that Reserve knew that the name of "Davis & Davis" was listed as an agent on the Reserve policies within a few days after the copy of the policy was returned to the home office.

In the accident report sent to the Department of Motor Vehicles Duckett stated, on the detachable form which is a part of the accident report, that Reserve insured him on September 7, 1961. This form was sent to Reserve by the Department on September 8, 1961. It was not returned to the Department by Reserve until August 9, 1962. After this disclaimer, returned approximately eleven months after the notice was sent to Reserve by the Department, a suspension notice was sent by the Department to Duckett on August 21, 1962, advising him that an order of suspension of license would be imposed upon him on September 5, 1962, unless he "posted a certified check, money order, et cetera, in the amount of $23.50." A form SR21 was thereafter filed on behalf of Reserve alleging coverage for Duckett which was received on August 30, 1962. Thereafter, by a letter dated September 28, 1962, Free State Adjusters (who had been employed by Reserve to investigate the Duckett accident and the accident was investigated by them) stated that the SR21 form submitted by them on behalf of Reserve was a mistake and they were withdrawing it. Then, on October 2, 1962, a letter was received by the Department from Reserve stating that "Mr. Prodoehl is not authorized to sign SR 21's for

the Reserve Insurance Company." It asked that his signature on any such forms of record be deleted.

John H. Bosley, an employee of the Department of Motor Vehicles, in addition to supplying the various records already mentioned, testified that a delay in returning an original disclaimer for almost a year was "not normal procedure by any means," and further that the purpose of sending the tear-off sheet from the bottom of the report was to determine whether to apply penalties under the Financial Responsibility Section of the Motor Vehicle Law and that suspension is to take place 90 days after the accident unless the motorist involved in the accident is insured.

The trial court found that there was an actual agency between Reserve and Davis; that in any event, there was an agency by estoppel, and that since Duckett had mailed his renewal premium payment money order to Davis prior to the expiration of the original policy and was told by a Davis representative that he was covered for the accident of September 7, 1961, Reserve was liable and must defend Duckett in the accident of September 7, 1961, and pay any judgment within the policy limits.

We are of the opinion that the evidence supports the trial court's conclusion that there was an agency by estoppel. As we stated in the opinion in the first appeal in this case, *Reserve Insurance Co. v. Duckett, supra,* quoting with approval from *Hobdey v. Wilkinson,* 201 Md. 517, 526, 94 A. 2d 625, 629 (1953):

> "One who knowingly permits another to act for him as though authorized, inducing third persons to rely to their disadvantage on the seeming authority, is estopped from later asserting the lack of authority of his apparent agent."

Reserve was aware that Davis appeared on the face of its policies as agent and from this was charged with knowledge that Davis was issuing its policies as agent. Although in a two-year period, 1960-1962, Reserve received 1011 copies of its policies with Davis appearing as agent, it never repudiated Davis or denied the validity of the issued policies. Even now,

in this case Reserve does not attempt to repudiate the validity of the renewal policy, but rests its claim upon the premise that the effective date of the renewal policy depends upon the alleged receipt date of the premium payment. Davis solicited the Reserve renewal policy by mailing the notice envelopes to Duckett who used them in reliance upon Davis. Davis represented to Duckett that he was covered by Reserve insurance by a renewal policy. Duckett has suffered a disadvantage resulting from the gap in insurance coverage at the time of the accident in view of his mailing the money order for the renewal premium prior to the expiration of coverage. Davis is, therefore, the agent of Reserve by estoppel.

The trial court was also of the opinion that under the evidence, an actual agency relationship existed between Reserve and Davis on the theory that St. Paul, as Reserve's general agent, had implied authority to engage Davis as its sub-agent and Reserve's acquiescence in regard to the policies issued by Davis, including the Duckett policies, was a ratification of the agency relationship. In view of our opinion that the trial court's conclusion was correct that under the evidence an agency by estoppel had been established, we do not find it necessary to pass upon the interesting question of whether an actual agency had been established by the evidence.

The final question for consideration is whether the "postal acceptance rule" or, as perhaps more frequently called, "The Rule in *Adams v. Lindsell*" [1] applies in determining whether Duckett accepted Reserve's offer, through Davis, to issue the renewal policy, so that there was a binding contract between Reserve and Duckett to issue that policy.

It is clear from the testimony of both Duckett and Mr. Davis that it was intended by the parties that the renewal policy would take effect immediately upon the termination of the original policy. The course of dealing between the parties indicated this, the general practice described by Mr. Davis confirms this and the effect of a "gap" between the termination of the original policy and the effective date of a renewal policy upon Duckett as the insured under the circumstances described in the testi-

1. 1 Barn. & Ald. 681, 106 Eng. Rep. 250 (1818, King's Bench).

mony in this case would require a conclusion that no such "gap" was intended by the parties. We, therefore, begin with the premise that the offer of Reserve was to renew the original policy immediately upon the termination of the original policy for an additional six month period. By sending the offer by mail and enclosing a self-addressed envelope for the return of the premium payment, Reserve designated the method of acceptance, i.e., by mail. The well established rule is that in the absence of any limitation or provision to the contrary in the offer, the acceptance of the offer is complete and the contract becomes binding upon both parties when the offeree deposits the acceptance in the post box. This rule was originally promulgated in the leading case of *Adams v. Lindsell, supra,* and has been generally adopted by the highest courts of appeal in the United States. This rule was adopted in Maryland by this Court in *Wheat v. Cross,* 31 Md. 99 (1869). It has been adversely criticized by many commentators. See 1 *Corbin, Contracts,* (1963 ed.) §78, pages 335-339; 1 *Williston, Contracts,* (3d ed. 1957) §81; *Simpson, Contracts,* (Hornbook Series) page 73; *Ashley, Contracts Inter Absentes,* 2 Col. L.R. 1 (1902) ; *Winfield, Some Aspects of Offer and Acceptance,* 55 L.Q.R. 499 (1939)[2] and *Samek, A Reassessment of the Present Rule Relating to Postal Acceptance,* 35 Aust. L.J. 38 (1961).[3]

---

**2.** Professor Winfield traces the spread of the rule of Adams v. Lindsell throughout the British Commonwealth and the United States. He gives a penetrating analysis of the various theories given for the rule with arguments both for and against the continuation of the rule.

**3.** Professor Samek, who is Senior Lecturer in Commercial Law at the University of Melbourne, concludes that the general rule that the offer is not accepted until the offeror receives the acceptance should be applied to postal acceptance as well. He points out that the postal acceptance exception to the general rule has not been extended to the Telex method of communication by the Court of Appeals in Entores v. Miles Far East Corporation, 2 Q.B. 327 (1955), in which Lord Justice Denning explained in some detail the reasons for not extending the postal acceptance exception to the acceptance of an offer by Telex. His opinion was concurred in by Birkett, L. J. and Parker, L. J., and leave to appeal to the House of Lords was denied. Professor Samek also points out that the postal acceptance rule has been repudiated in the United States

Although the postal acceptance rule appears to be a vestigial survival of the "subjective" theory of the formation of contracts held by the common law judges in England at the close of the Eighteenth Century and the beginning of the Nineteenth Century, the rule is too well established by authority to be abandoned now. Indeed, Professor Corbin, after reviewing the logical difficulties which the rule presents and the considerations of policy for and against the continuation of the rule, concludes that it is probably wiser to continue it. He aptly stated in 1 *Corbin,* §78, page 337:

> "One of the parties must carry the risk of loss and inconvenience. We need a definite and uniform rule as to this. We can choose either rule; but we must choose one. We can put the risk on either party; but we must not leave it in doubt. The party not carrying the risk can then act promptly and with confidence in reliance on the contract; the party carrying the risk can insure against it if he so desires. The business community could no doubt adjust itself to either rule; but the rule throwing the risk on the offeror has the merit of closing the deal more quickly and enabling performance more promptly. It must be remembered that in the vast majority of cases the acceptance is neither lost nor delayed; and promptness of action is of importance in all of them. Also it is the offeror who has invited the acceptance."

There is a most comprehensive and helpful review of the authorities generally in regard to this rule in *Morrison v. Thoelke,* 155 So. 2d 889 (Fla. 1963), which Professor Corbin char-

---

by the Court of Claims in Dick v. United States, 82 F. Supp. 326 (1949), and Rhode Island Tool Co. v. United States, 128 F. Supp. 417 (1955), on the ground that the Post Office Department had changed its regulations to permit the sender of a letter to retrieve the posted letter under certain circumstances. But see Dickey, Has there Been a Change in the Law on Acceptance of Contracts by Correspondence?, 38 Geo. L.J. 106 (1949), in which the author concludes that the postal acceptance rule is too well established in the United States to be overruled by the change in the postal regulations.

acterizes as "the most comprehensive review of the authorities and reasoning (beginning with *Adams v. Lindsell*) both judicial and academic that this author has seen." Acting Chief Judge Allen for the District Court of Appeal in Florida, Second District, reached the following conclusion:

> "This rule, although not entirely compatible with ordered, consistent and sometime artificial principles of contract advanced by some theorists, is, in our view, in accord with the practical considerations and essential concepts of contract law. See Llewellyn, Our Case Law of Contracts; Offer and Acceptance II 48 Yale L.J. 779, 795 (1939). Outmoded precedents may, on occasion, be discarded and the function of justice should not be the perpetuation of error, but, by the same token, traditional rules and concepts should not be abandoned save on compelling ground." (155 So. 2d at 904-05).

In 13 *Appleman, Insurance Law and Practice*, §7641, page 392, it is stated:

> "The renewal of a policy is a new contract of insurance as regards the requirements of mutual assent and new consideration. Any offer to renew an insurance contract accepted by the insured before revocation thereof by the insurer is a sufficient meeting of the minds to effect a binding renewal." (Footnotes omitted).

See *Colonial Life and Accident Ins. Co. v. Wilson*, 246 F. 2d 922 (5 Cir. 1957), quoting this statement from *Appleman* with approval and citing many cases in support of it in Note 10 on pages 927-928 of 246 F. 2d.

The burden of producing evidence that the offer of renewal sent by Davis as agent of Reserve contained a provision limiting the operating of the postal acceptance rule was upon Reserve as the plaintiff in the declaratory judgment action.[4] No

---

4. This rule will prevent the plaintiff, already given the procedural advantages incident to initiating suit, from obtaining a

such proof was produced by Reserve in this case, although secondary evidence would have been clearly admissible upon proof of the loss of the original offer and the absence of a copy of the original offer. The testimony of the stenographer or clerk who typed and sent the offer, a copy of the form used for such letters and possibly other secondary evidence would seem to be readily available. In any event, in the absence of proof of any provision in the offer changing the application of the rule, we must conclude that the rule is applicable. The trial court found as a fact that Duckett mailed the return envelope with the money order to pay the premium before the original insurance contract expired, thereby accepting the offer of Reserve to renew the insurance policy at the expiration of the original policy. Reserve was then bound by the contract.

In 14 *Appleman, Insurance Law and Practice,* §7990, pages 250-251, it is stated:

> "The effect of mailing a premium, as regards payment, depends wholly upon the intention of the parties. While generally payment of a premium would not be effected until actual receipt by the insurer, where the insurer or its authorized agent requests or directs payment by mail, it is paid when such premium is deposited in the post office. * * *
>
> "Where the insurer invites the insured to forward a premium through the mails, the government becomes the agent of the insurer for the purpose of transmitting the premiums, but, in the absence of other circumstances, it will be presumed that the insurer intended that the premium should be mailed in time to reach the office in due course on or before the day the premium is to fall due." (Footnotes omitted).

Reserve urges upon us that the last sentence quoted from *Appleman* with the decision of the Springfield Court of Appeals

---

directed verdict without producing any evidence. In this case we need not be concerned with the dispute as to the allocation of the risk of nonpersuasion that exists in cases in the insurance field where a declaration of nonliability is sought. See 62 Harv. L. Rev. 787, 836-839 (1949).

of Missouri in *Hood v. M. F. A. Mutual Insurance Co.,* 379 S. W. 2d 806 (1964), indicates that Duckett must show that the money order for the renewal premium was mailed in time to reach the Davis office on or before the time of the expiration of the original policy.

The last sentence quoted from §7990 of *Appleman, supra,* indicates that the presumption only occurs "in the absence of other circumstances." In the present case there were "other circumstances," i.e., the fact that Mrs. McAllister, the underwriter of Davis, after an examination of the Davis records, indicated on September 8, 1961, apparently after receipt by Davis of the renewal premium money order,[5] that Duckett was insured, thereby strongly indicating that whatever Duckett was required to do in regard to the time of the mailing of the renewal premium, had been done by him. Then too, Duckett's uncontradicted evidence was that his recollection was that he had mailed the money order for the renewal premium in the self-addressed envelope to Davis "four or five days" prior to September 7, 1961. He further testified that theretofore the *policies* would be returned to him sometimes "the next day or the day after" and that the longest time was "not more than three days." This testimony, uncontradicted and given by a witness called to testify *for the plaintiff,* Reserve, establishes that the ordinary course of post was less than three days as the *policies were returned to him* in Prince George's County from Baltimore City after mailing the premium payment from Prince George's County, so that it is obvious that the course of mail for a *one way* delivery was less than three days and, of course, was less than four or five days. The facts indicate, therefore, that Duckett had mailed the money order in time to have it received by Davis in due course of the post prior to the expiration of the original policy and that this fact, if it were required by the offer at all, was recognized by the Davis underwriter to have occurred.

In the *Hood* case the facts were quite different from those in the present case. In *Hood,* the money order was never received at all by the company's agent, no renewal policy was

5. Cf. Coile v. Commercial Travelers of America, 161 N. C. 104, 76 S. E. 622 (1912).

issued by the Company, the Company's agent advised the alleged insured that *he did not have coverage* and there was a provision in the original policy that the payment of any renewal policy must be "paid by the insured on or before the expiration of the current term *and received by the Company.*" (Emphasis supplied). In the *Hood* case the alleged insured was the plaintiff who had the burden of proving his case; in the present case Reserve is the plaintiff and the burden of producing evidence is upon Reserve, the insurance company. In addition to all of this, Hood failed to establish his damages in the *Hood* case and that case was remanded for a new trial. In our opinion, the decision in *Hood* is not apposite to the case at bar.

*Judgment affirmed, the costs to be paid by the appellant.*