919 A.2d 700

**Rebecca COCHRAN, et al.**

v.

**Eileen W. NORKUNAS.**

**No. 43, Sept. Term, 2006.**

Court of Appeals of Maryland.

March 20, 2007.

4

---

James L. Mayer (James L. Mayer, P.A., Columbia), on brief, for petitioners.

John C. Moffett (Moffett & Junkin, Chartered, Gaithersburg), on brief, for respondent.

Argued before BELL, C.J., RAKER, WILNER,* HARRELL, CATHELL, BATTAGLIA and GREENE, JJ.

RAKER, J.

This case arises out of the execution of a letter of intent for the purchase of property in Baltimore City between petitioners, Rebecca Cochran, et al., ("Buyers") and respondent Eileen W. Norkunas ("Seller"). We granted certiorari to consider the following two questions:

"1. When a contractual document, which states that it is a complete agreement, contains an integration clause and a clause stating that it cannot be modified except by an agreement in writing signed by the parties is duly executed by all parties, is it an error for a court to look outside of the four corners of the document to determine that a contract was formed?

2. Is a negotiated letter of intent that contains all essential and material terms of a proposed contract to be entered, supported by consideration, and executed by all parties an enforceable agreement under Maryland law?"

*Cochran v. Norkunas*, 393 Md. 477, 903 A.2d 416 (2006). We shall hold that because the parties did no t intend to be bound, the letter of intent is unenforceable. W e shall also hold that the contract is unenforceable because it was not accepted by the Seller.

## I.

Eileen Norkunas is the owner of property known as 835 McHenry Street, Baltimore, Maryland 21230. The petitioners, Robert and Hope Grove, and Robert and Rebecca Coch-

---

\* Wilner, J. now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

ran, expressed their interest in purchasing the property. Assisted by a real estate agent, the Buyers drafted a handwritten letter of intent that spelled out key terms of an offer. The text of the letter of intent stated as follows:

3/7/04

LETTER OF INTENT

We, Rebecca Cochran, Robert Cochran, Hope Grove and Robert Grove, Buyers—offer to buy 835 McHenry Street, Baltimore, Md. 21230 for $162,000. Payment by $5,000 check, this date and $157,000 by certified or cashiers funds not later than April 17, 2004.

A standard form Maryland Realtors contract will be delivered to Seller within 48 hours. Seller to pay only 1/2 normal transfer taxes and a 3% commission to Long & Foster. All other costs of closing to be paid by buyers. The contract will contain a financing requirement for buyers, but buyers will guarantee closing and not invoke the financing contingency.

We will delete the standard home inspection contingency.

[written in margin:] Buyer to honor seller's lease and offer tenants any renewal up to 12 months.

Buyers:

Robert Cochran: /s/

Rebecca Cochran: /s/

Hope Grove: /s/

Robert Grove: /s/

Agent:

Brian Best: /s/ [1]

Seller:

Eileen W. Norkunas: /s/

The Buyers presented the letter of intent and a deposit check for $5,000 to Ms. Norkunas. The parties signed the letter of intent on March 7, 2004. The Seller accepted the

---

1. The Buyers jointly stipulated that Brian Best was their real estate agent. Ms. Norkunas did not have an agent.

check, but there is no evidence in the record that the check was ever deposited or negotiated by the Seller.

Shortly after signing the letter of intent, Ms. Norkunas received a package of documents from the Buyers' real estate agent. The package included a cover letter that stated as follows:

Dear Ms. Norkunas,

It was a pleasure meeting you yesterday. Enclosed with this folder are all the documents needed to complete the sale of your home. The basic Real Estate contract, along with a couple of documents I need you to fill out to ratify the contract. The first is a Disclosure/Disclaimer. You can either fill out the first 3 pages (the Disclosure) or you can just sign the last page (the Disclaimer). Also included is a property fact sheet. This is just basic information on the property that needs to accompany the contract. The Groves and the Cochrans are so excited about your home. If you have ANY questions please feel free to call me or have someone near you look over the contract. Rest as-sure[d] that we want this to go as smooth as possible for you and both the Groves and Cochrans asked me to tell you if there is anything they can do please feel free to ask. I look forward to hearing from you.

You can either fax me the contract and disclaimer back or I'll include a Fed–X envelope for you to send back.

Thank you again

/s/

Brian Best

The package of documents contained a number of pre-printed forms, including a form titled "Residential Contract of Sale," published by the Maryland Association of Realtors, together with several form addenda.[2] The contract incorpo-

---

2. The addenda were titled as follows: (1) Conventional Financing Addendum to Contract of Sale, (2) Understanding Whom Real Estate Agents Represent, (3) General Addendum to Contract of Sale, (4) Notice to Purchaser of Purchaser's Rights Under Maryland's Property Disclo-

rated the terms of the letter of intent, and it contained several additional provisions that were not included in the letter of intent.[3] Many of the addenda appear to be forms published by the Maryland Association of Realtors. At least one of the addenda appears to be a form that the Buyers' broker developed. Some of the documents had blanks completed by the Buyers and/or their agent, including the financing contingency form. The "Property Inspections" contingency addendum that was included appears to have been struck through, as promised in the letter of intent.

After receiving the package of documents, the Seller read the contract and addenda. The Seller signed the contract and addenda on the majority of the signature lines, but the Seller crossed out and did not sign the financing contingency provisions in paragraphs 20 and 21. After reviewing the documents, the Seller did not return the documents to the Buyers or their agent, however. Nor did she otherwise communicate to the Buyers or their agent that she had accepted their offer. The Seller simply retained the signed documents. After a week or so had passed, the Seller communicated to the Buyers that she was taking the property off the market.

The Buyers initially filed suit seeking specific performance of the letter of intent. At her deposition, the Seller, Ms. Norkunas, was asked about her actions with regard to the

---

sure Law, (5) Notice to Buyer, Addendum Required by Maryland Homeowners Association Act, (6) Disclosure of Information on Lead–Based Paint and Lead–Based Paint Hazards, (7) Affiliated Business Arrangement Disclosure Statement, (8) Special Conditions (1): Commission to Long And Foster Realtors, (9) Notice to Buyers of Property in Baltimore City, (10) Property Inspections, (11) Commission, Fee Sharing and Bonus Disclosure, and (12) Sellers Proceeds from Settlement (Sellers Net).

3. For example, the contract provided that: (1) time was of the essence, (2) settlement would occur on April 17, 2004, (3) the Seller would pay the costs of any agricultural land transfer tax, (4) the Seller would pay to repair any termite infestation damage, (5) the Seller would ensure all electrical, heating, air conditioning, plumbing, and any other mechanical systems and related equipment, appliances, and smoke detectors were in working condition, and (6) certain items of personal property would be included in the conveyance of the property.

letter of intent and the package of documents. During this deposition, the Buyers first learned that the Seller had signed portions of the documents. The colloquy proceeded as follows:

"[Ms. Norkunas]: I was probably going through [the contract and addenda] at the time and kind of getting overwhelmed the more I went through it and questioning parts and kind of scratching out some parts. This was what I thought was going to be my counteroffer. I signed what I thought was going to be a counteroffer, and then it just got so overwhelming, it was too much. It was just too much.

[Buyers' counsel]: Well, you did sign the document; correct?

[Ms. Norkunas]: I signed my counteroffer.

[Buyers' counsel]: On Page 9 of 9 of Exhibit No. 3 [the contract] is that your signature on the left-hand side, the third signature down?

[Ms. Norkunas]: Yes.

[Buyers' counsel]: And that was placed by you on the document; correct?

[Ms. Norkunas]: Un-huh.

[Buyers' counsel]: It was placed there on March 11, 2004?

[Ms. Norkunas]: Un-huh.

[Buyers' counsel]: Yes?

[Ms. Norkunas]: Yes.

\* \* \*

[Buyers' counsel]: What in the contract form that was sent to you, Exhibit 3, were terms that were not contained in the original offer as you state or—I'll just limit it to that. What in the contract contained new terms that were not in the original offer?

[Ms. Norkunas]: I think the financing.

[Buyers' counsel]: For the record, state what paragraph number you're pointing to [on the contract].

[Ms. Norkunas]: Pardon me. Page 4 of 9, Paragraphs 20, 21.

[Buyers' counsel]: Those are the ones you in fact crossed out; right?

[Ms. Norkunas]: Yes. I was really—I don't know if this adheres to your same question, but I was really very conflicted about who was representing me in this deal, very conflicted.

[Buyers' counsel]: Well, did you call Mr. Best or anybody involved in that document, the letter of intent and the contract, and say there are new terms here that aren't in the original offer; I think they should be taken out?

[Ms. Norkunas]: No, I didn't say that. I was just getting so over my head and I wasn't being represented. I knew I was making a big mistake, and I just changed my mind. I said I can't do this. I can't do this.

[Buyers' counsel]: So is it accurate to say that you never called Mr. Best back or Mr. Grove, Mrs. Grove, Mr. Cochran, Mrs. Cochran and said there are some things about this contract I have a problem with; can we take them out or can you explain them to me? You didn't do that, did you?

[Ms. Norkunas]: No."

After learning for the first time at Ms. Norkunas' deposition that she had privately signed the contract and addenda that had been transmitted to her, the Buyers filed an amended complaint in which they asked the trial court to order that "the Letter of Intent and Contract of Sale between the parties be specifically enforced." The parties filed cross motions for summary judgment.

The parties stipulated that "the [Buyers] were not aware that [Ms. Norkunas] signed (and crossed out paragraphs 20 and 21 of) the Residential Contract of Sale dated March 7, 2004 until a copy of the Contract was produced by [Ms. Norkunas] through discovery in these proceedings." The Buyers also filed an affidavit asserting that the changes Ms. Norkunas had made to the unreturned contract documents would have been acceptable to the Buyers.

The Circuit Court for Baltimore City granted summary judgment in favor of the Buyers. The Order granting sum-

mary judgment in favor of the Buyers stated that the court was ordering specific performance because "the Letter of Intent and the Maryland Standard Residential Contract signed by all parties constitute the contract in this case and together they constitute an enforceable contract for sale." Accordingly, the court ordered that Ms. Norkunas "is to settle the property known as 835 McHenry Street in Baltimore, Maryland with Plaintiffs pursuant to the terms of the executed contract within 60 days." Ms. Norkunas appealed.[4]

The Court of Special Appeals, reviewing whether it was error to grant summary judgment for the Buyers, reversed the Circuit-Court, holding that the Circuit Court erred in determining that an enforceable contract was formed between the parties. *Norkunas v. Cochran*, 168 Md.App. 192, 895 A.2d 1101 (2006). The intermediate appellate court first concluded that the language of the letter of intent did not indicate that the parties had reached final agreement at the time the letter of intent was signed. Second, the court held that the Seller did not accept the contract, even though she signed the documents, because the Seller did not mail the signed contract to the Buyers so as to communicate her acceptance. Based on these holdings, the Court of Special Appeals vacated the Circuit Court's judgment. The Buyers filed a petition for a writ of certiorari, which we granted. *Norkunas*, 393 Md. 477, 903 A.2d 416.

## II.

We review *de novo* a circuit court's grant of summary judgment. *Aventis Pasteur, Inc. v. Skevofilax*, 396 Md. 405,

---

**4.** The Buyers moved to dismiss the appeal, alleging that the order did not fully dispose of all claims, such as ancillary damages and attorneys' fees. Ms. Norkunas responded that the court's order was immediately appealable pursuant to Md.Code (1973, 2006 Repl.Vol.) § 12–303(3)(v) of the Courts and Judicial Proceedings Article, which authorizes an interlocutory appeal from an order "[f]or the sale, conveyance, or delivery of real or personal property." The Court of Special Appeals held that the Circuit Court's order was appealable pursuant to this provision. The issue is not before this Court.

**12**

440, 914 A.2d 113, 134 (2007). We independently review the record to determine whether the parties properly generated a dispute of material fact and, if not, whether the party in whose favor judgment was entered is entitled to judgment as a matter of law. Md. Rule 2–501(f). *See also Hill v. Knapp,* 396 Md. 700, 711–13, 914 A.2d 1193, 1199 (2007). On appeal from an order entering summary judgment, we review only the legal grounds relied upon by the trial court in granting summary judgment. Md. Rule 2–501(f). *See also River Walk Apartments, LLC v. Twigg,* 396 Md. 527, 541–42, 914 A.2d 770, 778–79 (2007). In the case *sub judice,* there is no genuine dispute of material fact.

## III.

A letter of intent is a form of a preliminary agreement.[5] Letters of intent have led to "much misunderstanding, litiga-

---

5. Preliminary agreements—whether oral or in writing—cannot be easily generalized, as they range from firm binding commitments to agreements that presuppose no binding obligations on the parties. *See Burbach Broadcasting Co. of Del. v. Elkins Radio,* 278 F.3d 401, 406–07 (4th Cir.2002); 1 JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 2.8 and § 2.9, p. 131–62 (Rev. ed.1993). Several courts and commentators have found it helpful to distinguish between different types of preliminary agreements. *See* 1 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 3.26b, p. 391–400 (3rd ed.2004) (discussing categories and compiling cases); CORBIN ON CONTRACTS, *supra* at § 2.8 and § 2.9, p. 131–62 (addressing partial agreements and situations where formal documents are contemplated).

Courts have identified four main categories of preliminary agreements; these categories are similar to those that have been identified for letters of intent. *Cf.* CORBIN ON CONTRACTS, *supra* at § 2.9, p. 157–58. Judge Pierre N. Leval's often cited decision, *Teachers Ins. and Annuity Ass'n v. Tribune Co.,* 670 F.Supp. 491 (S.D.N.Y.1987), described two types of preliminary agreements that have binding force. A fully binding preliminary agreement (also known as a "Tribune Type I") occurs when the parties have reached complete agreement (including the agreement to be bound) on all issues perceived to require negotiation. *Id.* at 498. For such an agreement, a more elaborate formalization of the agreement is not necessary because the agreement is preliminary only in form and is thus enforceable as it stands. *Id.* The second type, a binding preliminary commitment (also known as a "Tribune Type II"), exists when the parties accept a mutual commitment to negotiate together in good faith regarding any remaining open

tion and commercial chaos." 1 Joseph M. Perillo, Corbin on Contracts § 1. 16, p. 46 (Rev. ed.1993). It is recognized that some letters of intent are signed with the belief that they are letters of commitment and, assuming this belief is shared by the parties, the letter is a memorial of a contract. *Id.* In other cases, the parties may not intend to be bound until a further writing is completed. *Id.*

Commentators have analyzed the variety of cases in which parties contemplated memorializing their terms of agreement into a more formal document. Based on this analysis, they have classified letters of intent into four categories. *See* Corbin on Contracts, *supra* at § 2.9, p. 157–58. These four categories are described as follows:

"(1) At one extreme, the parties may say specifically that they intend not to be bound until the formal writing is executed, or one of the parties has announced to the other such an intention. (2) Next, there are cases in which they clearly point out one or more specific matters on which they must yet agree before negotiations are concluded. (3) There are many cases in which the parties express definite agreement on all necessary terms, and say nothing as to other relevant matters that are not essential, but that other people often include in similar contracts. (4) At the opposite extreme are cases like those of the third class, with the addition that the parties expressly state that they intend their present expressions to be a binding agreement or contract; such an express statement should be conclusive on the question of their 'intention.' "

---

terms. *Id. See also* Corbin on Contracts, *supra* at § 2.8(b), p. 142–44. If negotiations fail, no final contract exists because this type of preliminary agreement does not commit the parties to their ultimate contractual objective, in contrast to a "Tribune Type I" agreement. Corbin on Contracts, *supra* at § 2.8(b), p. 142–44.

The types of preliminary agreements that are generally not binding include the agreement with open terms, where the parties agree to be bound by some terms but leave others open for the court to fill in. *See* Farnsworth on Contracts, *supra* at § 3.26b, p. 399. The fourth type of preliminary agreement, one that is not considered an enforceable agreement, is an agreement to agree. *See* Corbin on Contracts, *supra* at § 2.8(a), p. 131–42.

*Id.* (internal citations omitted). A valid contract generally has been made if a letter of intent properly falls within either the third or the fourth category. *Id.* at 158.

## IV.

■ We must decide whether the negotiated letter of intent at issue in this case created an enforceable agreement under Maryland law. Petitioners assert that the letter of intent constitutes an enforceable contract because it was formed by offer and acceptance, supported by consideration, contained all definite and material terms, and was signed by the parties. Respondent replies that the letter of intent was not an enforceable contract because it was not intended, based on an objective review, to be the parties' final expression of their mutual assent. Our analysis begins with whether the letter of intent constitutes an enforceable agreement.

■ It is universally accepted that a manifestation of mutual assent is an essential prerequisite to the creation or formation of a contract. *See Creel v. Lilly,* 354 Md. 77, 101, 729 A.2d 385, 398 (1999); *Eastover Stores, Inc. v. Minnix,* 219 Md. 658, 665, 150 A.2d 884, 888 (1959). Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms. *See* CORBIN ON CONTRACTS, *supra* at § 2.8, p. 131. Failure of parties to agree on an essential term of a contract may indicate that the mutual assent required to make a contract is lacking. *See Safeway Stores v. Altman,* 296 Md. 486, 489–90, 463 A.2d 829, 831 (1983); *Klein v. Weiss,* 284 Md. 36, 63, 395 A.2d 126, 141 (1978). If the parties do not intend to be bound until a final agreement is executed, there is no contract. *See Eastover Stores, Inc.,* 219 Md. at 665, 150 A.2d at 888; *Peoples Drug Stores v. Fenton Realty Corp.,* 191 Md. 489, 494, 62 A.2d 273, 275–76 (1948). *See also* CORBIN ON CONTRACTS, *supra* at § 2.9, p. 151; 1 RICHARD A. LORD, WILLISTON ON CONTRACTS § 4:8, p. 302 (Rev. ed.1990); Restatement (Second) of Contracts § 27 (1981). In the case *sub judice,* we assume *arguendo* that the letter of intent contained all essential material terms, and we need not address whether the letter of intent contained all the material terms essential to

complete a contract, because it is clear that the parties did not intend to be bound by the letter of intent alone.

Courts and commentators have identified several factors that may be helpful in determining whether the parties have manifested an intention to be bound. Judge Pierre N. Leval, writing for the United States District Court for the Southern District of New York, set forth five factors that have been widely cited by other courts: (1) the language of the preliminary agreement, (2) the existence of open terms, (3) whether partial performance has occurred, (4) the context of the negotiations, and (5) the custom of such transactions, such as whether a standard form contract is widely used in similar transactions. *Teachers Ins. and Annuity Ass'n v. Tribune Co.*, 670 F.Supp. 491, 499–503 (S.D.N.Y.1987). *See also Burbach Broadcasting Co. of Del. v. Elkins Radio*, 278 F.3d 401, 408 (4th Cir.2002).

Comment (c) to the Restatement (Second) of Contracts identifies additional factors including: (1) whether the agreement has few or many details, (2) whether the amount involved is large or small, and (3) whether it is a common or unusual contract. Restatement (Second) of Contracts § 27, cmt. c. *See also* CORBIN ON CONTRACTS, *supra* at § 2.9, p. 159. It is recognized that any or all of these factors may be shown by oral testimony or by correspondence or other preliminary or partially complete writings.[6] *See* Restatement (Second) of Contracts § 27, cmt. c. Each of the above-named factors may be relevant in determining whether a letter of intent is enforceable, but the most important factor is the language of the agreement. *See Teachers Ins.*, 670 F.Supp. at 499.

---

**6.** We note that parol evidence may be used to contravene the legal existence of a contract. *Gordy v. Ocean Park, Inc.*, 218 Md. 52, 62, 145 A.2d 273, 278 (1958). *See also Burke v. Dulaney*, 153 U.S. 228, 234, 14 S.Ct. 816, 818, 38 L.Ed. 698 (1894); *In re Murphy*, 810 F.2d 454, 455 (4th Cir.1987). Parol evidence presupposes the existence of a legally effective written agreement. Thus, parol evidence need not be excluded until it is established that a contract is in effect.

 We analyze the parties' intent to be bound according to the principles of Maryland contract law because petitioner asserts that a valid contract was formed. Maryland adheres to the principle of the objective interpretation of contracts.[7] *See Myers v. Kayhoe,* 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Tomran v. Passano,* 391 Md. 1, 13, 891 A.2d 336, 344 (2006); *Kasten Constr. v. Rod Enterprises,* 268 Md. 318, 328, 301 A.2d 12, 17–18 (1973). If the language of a contract is unambiguous, we give effect to its plain meaning and do not contemplate what the parties may have subjectively intended by certain terms at the time of formation.[8] *See Dennis v. Retirement System,* 390 Md. 639, 656–57, 890 A.2d

---

7. The interpretation of a contract, including the question of whether the language of a contract is ambiguous, is a question of law subject to *de novo* review. *See Towson v. Conte,* 384 Md. 68, 78, 862 A.2d 941, 946 (2004).

8. The United States Court of Appeals for the Fourth Circuit described the challenge that a court faces when granting summary judgment on a matter of contract interpretation in *Washington Metropolitan Area Transit Authority v. Potomac Investment Properties, Incorporated,* 476 F.3d 231 (4th Cir.2007). The Fourth Circuit stated as follows:

"A court faces a conceptually difficult task in deciding whether to grant summary judgment on a matter of contract interpretation. Only an unambiguous writing justifies summary judgment without resort to extrinsic evidence, and no writing is unambiguous if susceptible to two reasonable interpretations. The first step for a court asked to grant summary judgment based on a contract's interpretation is, therefore, to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face. If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue. **Even where a court, however, determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis. If,** however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact.

Therefore, summary judgment is appropriate when the contract in question is unambiguous or when an ambiguity can be definitively resolved by reference to extrinsic evidence."

*Id.* at 235 (internal citations omitted).

737, 747 (2006); *Rourke v. Amchem,* 384 Md. 329, 354, 863 A.2d 926, 941 (2004). Thus, our search to determine the meaning of a contract is focused on the four corners of the agreement. *Walton v. Mariner Health,* 391 Md. 643, 660, 894 A.2d 584, 594 (2006).

Under the objective theory of contracts, we look at what a reasonably prudent person in the same position would have understood as to the meaning of the agreement. *Id.* Ambiguity arises if, to a reasonable person, the language used is susceptible of more than one meaning or is of doubtful meaning. *See United Services v. Riley,* 393 Md. 55, 80, 899 A.2d 819, 833 (2006). As we have previously explained:

> "A court construing an agreement under [the objective theory] must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant."

*General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985). When determining intent, the "customary, ordinary, and accepted meaning" of the language is used. *Walton,* 391 Md. at 660, 894 A.2d at 594. In addition, Maryland utilizes the following rule of construction when interpreting contracts:

> "A recognized rule of construction in ascertaining the true meaning of a contract is that the contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed."

*Sagner v. Glenangus Farms,* 234 Md. 156, 167, 198 A.2d 277, 283 (1964).

V.

We first review the language of the letter of intent to determine if the parties intended to be bound. The letter of intent is a one-page, handwritten document with essentially five paragraphs. The first paragraph states that the Buyers "offer to buy" the property for $162,000 with payment "by $5,000 check, this date and $157,000" not later than April 17, 2004. The second paragraph states that a "standard form Maryland Realtors Contract *will be delivered* to Seller within 48 hours" (emphasis added). The letter of intent also sets forth some financing details, specifically stating that *"[t]he contract will contain* a financing requirement for buyers, but buyers *will guarantee* closing and *not invoke* the financing contingency" (emphasis added). The Buyers also stated that *"[w]e will delete* the standard home inspection contingency" (emphasis added). Finally, the letter of intent states in the margin that, "Buyer to honor seller's leases."

We conclude that a reasonable person would have understood the letter of intent to mean that a formal contract offer was to follow the letter of intent. Three of the paragraphs in the letter of intent make direct reference to the Maryland Realtors Contract and the terms that shall be included in that contract. The plain language of the letter of intent in this case is unambiguous and indicates clearly that the parties intended to finalize the property sale through a standard form Maryland Realtors Contract.

This Court has noted previously that parties may "enter into a binding informal or oral agreement to execute a written contract; and, if the parties contemplate that an agreement between them shall be reduced to writing before it shall become binding and complete, there is no contract until the writing is signed." *Eastover Stores, Inc.,* 219 Md. at 665, 150 A.2d at 888. In *Eastover Stores, Inc.,* the owner of a shopping center contended that an enforceable contract was entered into when the contractors' bid was accepted, as opposed to

when a formal written agreement was executed by the parties approximately one month later. *Id.* at 664–65, 150 A.2d at 887–88. We noted that parties who contemplated that their agreement would b e reduced to a final writing before it would become binding were at liberty to withdraw from negotiations prior to when the final writing is signed. *Id.* at 665, 150 A.2d at 888. We then affirmed the lower court's determination that the contractors had not manifested their assent to final formation of the contract prior to when the agreement was finally executed by the contractors and delivered to the shopping center owner. *Id.* at 666, 150 A.2d at 888.

Similarly, in *Peoples Drug Stores,* 191 Md. 489, 62 A.2d 273, we held that the parties did not intend to conclude their lease and building contract via correspondence letters, but were only settling the terms of a future agreement that they planned to enter after the particulars were completely reconciled. *Id.* at 495, 62 A.2d at 276. We summarized the relevant contract law as follows:

"It is familiar law that a valid contract may be entered into by letters. Where one party makes a definite offer by letter and the other party accepts the offer unconditionally on the same terms on which it was made, the letters constitute a binding contract. But, of course, the parties can make the completion of their contract depend upon the execution of a written instrument. The question whether the parties negotiating a contract intended to be bound by their oral agreement but contemplated a written instrument merely as evidence of their agreement, or whether they did not intend to bind themselves until a contract was prepared and signed by them, must be decided from the facts and circumstances in each particular case. If it appears that the terms of the contract are in all respects definitely understood and agreed upon, and there is nothing left for future settlement, and that a part of the understanding of the parties is that a written contract embodying these terms shall be executed by them to serve merely as evidence of their agreement, the mere fact that the parties understood that the contract should be reduced to writing does not leave the transaction incomplete and without binding force.

> *If, on the other hand, it appears that the parties, although they agreed upon all the terms of the contract, intended to have them reduced to writing and signed before the bargain should be considered as complete, neither party will be bound until that is done, as long as the contract remains without any acts done under it on either side."*

*Id.* at 493–94, 62 A.2d at 275–76 (internal citations omitted) (emphasis added). In Peoples Drug Stores, the offer and acceptance letters indicated that the final agreement was "subject to approval of the lease." *Id.* at 492, 62 A.2d at 275. We concluded that the parties intended to be bound by a final agreement that was carefully drawn and that the correspondence leading up to that agreement was not enforceable. *Id.* at 494–95, 62 A.2d at 276.

In the case *sub judice*, the letter of intent states explicitly that a "standard form Maryland Realtors Contract will be delivered to Seller within 48 hours" and describes how certain terms of that contract will be construed.[9] We conclude that the language in the letter of intent is indicative of an intent to memorialize the property sale through a final standard form contract, just as a final agreement was intended by the parties in *Eastover Stores, Inc.* and *Peoples Drug Stores.* Here,

---

**9.** We note that the label "letter of intent" is not necessarily controlling, although it may be a helpful indicator of the parties' intentions. *See Burbach Broadcasting Co. of Del. v. Elkins Radio,* 278 F.3d 401, 406 (4th Cir.2002) ("Calling a document a 'letter of intent' implies, *unless circumstances suggest otherwise,* that the parties intended it to be a nonbinding expression in contemplation of a future contract." (emphasis in original)); *Teachers Ins. and Annuity Ass'n v. Tribune Co.,* 670 F.Supp. 491, 497 (S.D.N.Y.1987) ("Labels such as 'letter of intent' or 'commitment letter' are not necessarily controlling although they may be helpful indicators of the parties' intentions."). Similarly, express conditions are indicative of parties' intent. *See, e.g., Paramount Brokers, Inc. v. Digital River, Inc.,* 126 F.Supp.2d 939, 947 (D.Md.2000) (concluding that an express condition in a letter showed the parties' intent to make a finalized agreement); *Phoenix Mut. Life Ins. v. Shady Grove Plaza Ltd.,* 734 F.Supp. 1181, 1186 (D.Md.1990) (holding that the parties did not enter an enforceable contract where a letter of intent was expressly non-binding); *Teachers Ins.,* 670 F.Supp. at 507–08 (determining that a letter of intent which expressly stated it would be binding was an enforceable contract).

there is no question that the parties demonstrated an intent to use a Maryland Realtors Contract to formalize their agreement.

Petitioner's assertion that the letter of intent is enforceable because it was formed by offer and acceptance, supported by consideration, satisfied the statute of frauds, and contained all definite and material terms is unpersuasive because there is no binding contract if the parties do not intend to be bound until a formal document is executed. *See Eastover Stores, Inc.,* 219 Md. at 665, 150 A.2d at 888; *Peoples Drug Stores,* 191 Md. at 494, 62 A.2d at 275–76. *See also* CORBIN ON CONTRACTS, *supra* at § 2.9, p. 151; WILLISTON ON CONTRACTS, *supra* at § 4:8, p. 302; Restatement (Second) of Contracts § 27; Restatement (First) of Contracts § 26 (1932). As stated by Professor Corbin, "If the court is convinced that the parties intended not to be bound until the formal document is executed, there is no contract until its execution by both parties." CORBIN ON CONTRACTS, *supra* at § 2.9, p. 151.

The language of the letter of intent does not support the Buyers' contention that the parties had reached a final agreement regarding the sale of the property at the time when the letter of intent was signed because the parties had no intent to be bound until the standard form Maryland Realtors Contract was signed. Thus, the letter of intent is not an enforceable contract for a sale of the property and is not subject to specific performance. *See Post v. Gillespie,* 219 Md. 378, 386, 149 A.2d 391, 396 (1959) (holding that specific performance is not an available remedy when a valid and enforceable contract is lacking). The letter of intent does not fall into one of the categories of enforceable letters of intent or preliminary agreements. *See* CORBIN ON CONTRACTS, *supra* at § 2.9, p. 157–58; *Teachers Ins.,* 670 F.Supp. at 491. We hold that the letter of intent is the type of preliminary "agreement to agree" that has generally been held unenforceable in Maryland.[10] *See Horsey v. Horsey,* 329 Md. 392, 420, 620 A.2d 305, 319 (1993).

---

**10.** Because the parties' intent can be discerned on the face of the letter of intent, we do not consider other factors that have been utilized to

## VI.

We now consider whether the standard Maryland Realtor's Contract is enforceable.[11] Petitioners argue that the contract is enforceable because the document states that it is a complete agreement, contains an integration clause and a clause stating that it cannot be modified except by an agreement in writing signed by the parties, and was duly executed by all parties. Petitioners further assert that the Court of Special Appeals erred by holding that delivery of the contract by the Seller was required to create an enforceable contract. Respondent replies that the contract was not enforceable because it was neither delivered nor manifested through the Seller's acts, and, at most, the signed contract represented the Seller's counteroffer, as opposed to acceptance, which was not communicated to the Buyers.[12] We hold that the Seller did not accept the contract, and thus it is not enforceable.

---

determine whether parties have manifested an intent to be bound. For example, we do not consider the relevance of the fact that the Buyers delivered a deposit check of $5,000 upon the signing of the letter of intent. The Buyers have not alleged that the Seller negotiated the check improperly or that the Seller ever negotiated the check, and these issues are not before this Court. We need consider only the language in the letter of intent stating that the Buyers offered to buy the property "by $5,000 check, this date and $157,000 by certified or cashiers funds." The aforementioned language expresses the Buyers' offer, but does not persuade us that transfer of the deposit check indicated a finalized sale of the property.

11. In their petition for writ of certiorari, petitioners ask whether it is error for a court to look outside the four corners of a document to determine if a contract was formed. As discussed *supra,* note 6, extrinsic evidence may be used to contravene the legal existence of a contract. Thus, on review of a summary judgment motion where there are no disputed material facts, a court's analysis may consider all the facts and circumstances of the case. The parties' briefs do not focus on the question presented in the writ of certiorari, but ask us to consider whether the contract was enforceable. Thus, we address this question *infra.*

12. Respondent asserts that, in crossing out paragraphs 20 and 21 of the contract, she converted the document into a counteroffer. Because of our holding, we need not determine whether the changes made by respondent to the contract and addenda would have required further assent from the Buyers in order to complete formation of the contract.

 Creation of a contract requires an offer by one party and acceptance by the other party. *See David A. Bramble, Inc. v. Thomas,* 396 Md. 443, 455, 914 A.2d 136, 143 (2007); *Buffalo Steel Co. v. Kirwan,* 138 Md. 60, 64, 113 A. 628, 630 (1921). Acceptance of an offer is requisite to contract formation, and common to all manifestations of acceptance is a demonstration that the parties had an actual meeting of the minds regarding contract formation. *See Creel,* 354 Md. at 101, 729 A.2d at 398 (reiterating that to establish a contract the minds of the parties must be in agreement as to its terms); *Pavel v. A.S. Johnson,* 342 Md. 143, 162–63, 674 A.2d 521, 531 (1996) (holding that no contract was formed because there was no meeting of the minds).

 Acceptance may be manifested by acts as well as by words. *See, e.g., Porter v. General Boiler Casing Co.,* 284 Md. 402, 411, 396 A.2d 1090, 1095 (1979) (determining that summary judgment was inappropriate where a material issue of fact existed as to whether a parties' conduct clearly manifested an intention to accept and to be bound by the terms of the contract); *Chesapeake, Etc. v. Manitowoc,* 232 Md. 555, 567, 194 A.2d 624, 630 (1963) (receipt of check finalized a contract of sale); *Duplex Envelope Co. v. Balto. Post Co.,* 163 Md. 596, 605, 163 A. 688, 691 (1933) (holding that where plaintiff delivered as per the contract and defendant accepted such items, "an acceptance may be indicated by acts as well as by words"). In some cases, we have held that silence or inaction upon receipt of an offer may constitute acceptance, but this is the exception and not the general rule. *See International Broth. of Teamsters v. Willis Corroon Corp.,* 369 Md. 724, 738 n. 3, 802 A.2d 1050, 1058 n. 3 (2002) (stating that as "a general rule of contract law, silence and inaction upon receipt of an offer do not constitute an acceptance of the offer"); *cf. GEICO v. Medical Services,* 322 Md. 645, 655, 589 A.2d 464, 468–69 (1991) (silence and inaction can operate as an acceptance of an offer in a few limited circumstances). Silence is generally not to be considered an acceptance of an offer unless the parties had agreed previously that silence would be an acceptance, the offeree has taken the benefit of the offer, or

because of previous dealings between the parties, it is reasonable that the offeree should notify the offeror if she does not intend to accept. *See Attorney Griev. Comm'n v. McIntire,* 286 Md. 87, 93, 405 A.2d 273, 277 (1979). *See also* CORBIN ON CONTRACTS, *supra* at § 3.21, p. 416; Restatement (Second) of Contracts § 69.

A common way to communicate acceptance of an offer is through the mail.[13] Maryland has long followed the "postal acceptance rule" for determining when an offer received by mail has been accepted. *See Lee v. State,* 332 Md. 654, 663 n. 3, 632 A.2d 1183, 1187 n. 3 (1993) (noting that Md. Rule 1–321(a) uses the "mailbox rule" and stating that the rule provides that acceptance by mail of an offer is ordinarily effective upon depositing that acceptance in the mailbox); *Reserve Insurance v. Duckett,* 249 Md. 108, 117, 238 A.2d 536, 541 (1968) (applying the postal acceptance rule to conclude that an individual had accepted an insurance policy by mailing a money order in time to have it received before expiration of the original insurance policy); *Wheat v. Cross,* 31 Md. 99, 103 (1869) (adopting postal acceptance rule). The postal acceptance rule "is a principle of the common law of contracts that basically provides that acceptance by mail of an offer is ordinarily effective upon depositing that acceptance in the mailbox." *Lee,* 332 Md. at 664 n. 3, 632 A.2d at 1187 n. 3. We have described the traditional postal acceptance rule as follows:

> "The well established rule is that in the absence of any limitation or provision to the contrary in the offer, the acceptance of the offer is complete and the contract becomes binding upon both parties when the offeree deposits the acceptance in the post box. This rule was originally promulgated in the leading case of *Adams v. Lindsell,*

---

**13.** The cover letter enclosed with the contract and addenda indicates that the Buyers' expected the Seller to respond in a manner that would follow the principles established in the postal acceptance rule. The cover letter states, "[y]ou can either fax me the contract and disclaimer back or I'll include a Fed–X envelope for you to send back."

[ (1818) 106 Eng. Rep. 250 (K.B.) ], and has been generally adopted by the highest courts of appeal in the United States. This rule was adopted in Maryland by this Court in *Wheat v. Cross,* 31 Md. 99 (1869)."

*Reserve Insurance,* 249 Md. at 117, 238 A.2d at 541. As stated in the Restatement (Second) of Contracts, "an offer is operative and completes the manifestation of mutual assent as soon as put out of the offeree's possession." Restatement (Second) of Contracts § 63; *accord* 2 WILLISTON ON CONTRACTS, *supra* at § 6:37, p. 395 (stating that an "acceptance is dispatched within the meaning of the rule under consideration when it is put out of the possession of the offeree and within the control of the postal authorities, telegraph operator, or other third party authorized to receive it").

In the instant case, the parties stipulated that "the [Buyers] *were not aware* that [Ms. Norkunas] signed (and crossed out paragraphs 20 and 21 of) the Residential Contract of Sale dated March 7, 2004 until a copy of the Contract was produced by [Ms. Norkunas] through discovery in these proceedings" (emphasis added). Thus, the Seller did not manifest an assent to the contract in accordance with the postal acceptance rule because she did not put the contract out of her possession until production of the contract was required through discovery. Nor did the Seller manifest her assent through silence. Acceptance through silence is generally not considered acceptance and none of the exceptions to the general rule are present in this case. *See* Restatement (Second) of Contracts § 69. Indeed, after receiving the contract, the Seller communicated to the Buyers that she had rejected their offer and did not intend to sell her property.

The Buyers argue that the Seller accepted the contract merely by signing the document, particularly because of the provisions in Section 48 of the contract.[14] The Buyers rely on

---

14. Section 48 of the contract states as follows:

"ENTIRE AGREEMENT: This Contract and any Addenda thereto contain the final and entire agreement between the parties, and neither they nor their agents shall be bound by any terms, conditions,

the language in Section 48 of the contract that states: "The parties to this Contract mutually agree that it is binding upon them . . . Once signed, the terms of the Contract can only be changed by a document executed by all parties." But Section 48 of the contract also specifies that "this Contract shall be interpreted and construed in accordance with the laws of the State of Maryland." The Buyers do not cite any supporting authority for their assertion that a document signed in private and never delivered or manifested by the Seller's acts constitutes an enforceable contract.[15] Indeed, under Maryland law, a contract is not formed until there is acceptance.

In the case *sub judice*, the Seller had second thoughts about selling her home and, although she signed portions of the contract, she did not manifest her acceptance by communicating with the Buyers. The Buyers were unaware that the contract was signed until discovery occurred, and thus the parties did not have a meeting of the minds regarding the contract. To create a contract, notice of acceptance must be communicated to the offeror. Signing the contract in private without transmitting the documents or otherwise communicating acceptance to the Buyers or their agent does not create an enforceable agreement. The Seller's only communication to the Buyers after receipt of their contract offer was that she was no longer selling her property and this constituted a

statements, warranties or representations, oral or written, not herein contained. The parties to this Contract mutually agree that it is binding upon them, their heirs, executors, administrators, personal representatives, successors and, if permitted as herein provided, assigns. Once signed, the terms of this Contract can only be changed by a document executed by all parties. This Contract shall be interpreted and construed in accordance with the laws of the State of Maryland. It is further agreed that this Contract may be executed in counterparts, each of which when considered together shall constitute the original Contract."

**15.** The Buyer's reliance, for example, on *Ray v. Eurice*, 201 Md. 115, 93 A.2d 272 (1952) is misplaced. Both parties in *Ray* manifested acceptance because they signed the contract in the presence of each other. *Id.* at 118, 93 A.2d at 275. The only question in that case was whether both of the parties had assented to certain building specifications attached to the agreement. *Id.* at 122, 93 A.2d at 276.

rejection of their offer. We hold that the Seller did not accept the contract, and thus it was not an enforceable agreement.

***JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONERS.***